**SLIFKA et al. v. JOHNSON.**
No. 182, Docket 20490.

Circuit Court of Appeals, Second Circuit.
March 12, 1947.

Pfeiffer & Crames, of New York City (Alexander Pfeiffer and Clarence S. Bar-

asch, both of New York City, of counsel), for plaintiffs-appellants.

John F. X. McGohey, U. S. Atty., of New York City (John B. Creegan, Asst. U. S. Atty., of New York City, of counsel), for defendant-appellee.

Before L. HAND, AUGUSTUS N. HAND and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

At various times from 1919 to 1936 certain policies of life insurance were issued on the life of George Shustek on his own applications and all premiums were paid by him from the times of issuance until the date of his death on April 25, 1941. In 1935 an insurance broker advised the separation of his insurance estate from his general estate, pointing out that the proceeds of insurance policies could on his death be paid directly to his wife and daughter by the insurance companies without waiting for the probate of a will and the qualification of executors and thus avoid the payment of taxes by his estate. The broker also suggested that Schustek take out an additional policy so that he might be examined and have a record of physical examination "in the event any question in the tax angle developed * * * as to whether or not these policies were being transferred in contemplation of death * * *". He took out the additional policy. The policies, which were then in a revocable trust, were taken out of the trust and transferred so as to become payable on his death to certain beneficiaries. This was arranged by the broker at the request of the insured. Schustek had authorized the insurance companies to furnish the broker with information and forms. The broker wrote the companies which had issued the policies giving them instructions as to the transfers that were required in order to meet the wishes of the insured and the changes to be made, saying in each case: "The above change to be on the irrevocable plan and is for the purpose of avoiding payment of tax. It is the insured's intention that with the consent of his wife that loans be available during his life time."

Twelve policies, aggregating $117,400, are involved in the case at bar and it was successfully contended before the trial

court that the proceeds of each are to be included in Schustek's estate and to be subjected to estate taxes. Eight of the policies were rewritten by the Equitable Life, New York Life, Connecticut Mutual Life, Prudential Life and Metropolitan Life respectively. The proceeds of these policies were to be paid to the insured's wife, if living at the time of his death; to his daughter, should his wife not then be living; if the daughter should not be then living to her children; or if no such children should be living, to the executors, administrators and assigns of the insured, except that the policies issued by the New York Life Insurance Company were assigned to the wife subject to the terms of the settlement agreements; the policy issued by the Prudential Company provided that the assignment should not operate to revoke the outstanding income agreement; and the policy issued by the Metropolitan Life Insurance Company purported to vest the rights in the policy in the wife during her life only, then in the daughter during her life, then in the executors or administrators of the insured.

Under settlement agreements the four policies rewritten by the Mutual Life Insurance Company (having a face value of $35,000) had the same general beneficiary scheme as the other eight policies except that there was no express provision for the payment of the proceeds to the insured's estate if the beneficiaries should predecease him. The Mutual Life policies were payable to the wife, if living at the date of the husband's death, or, if not, to the daughter; or if the wife and daughter were not then living to the children of the daughter and, should there be no children of the daughter, to the executors or administrators of the wife or daughter whichever one of them was last deceased. In the case of the death of the wife and daughter and of the children of the daughter prior to that of the grantor, the estate of the latter might receive an interest in the proceeds by operation of law—that is to say, if the wife should die last without issue, parents, brothers, sisters, nephews or nieces, and should leave no will, the grantor's estate would receive the entire proceeds of the Mutual Life policies and he might dispose of them

by his will. If the daughter should die last without issue, brothers, sisters, nephews or nieces, and should leave no will, the proceeds of the policies would also be subject to disposition by the decedent's will.

In the eight policies there plainly was a reversionary interest in the donor reserved in the instruments of settlement. Goldstone v. United States, 325 U.S. 687, 65 S.Ct. 1323, 89 L.Ed. 1871, 159 A.L.R. 1330. In the four policies of insurance of the Mutual Life there was no reversionary interest expressly reserved by the donor, but under the provisions of each policy there was a remote reversionary interest which might take effect by operation of law if the remainder interests in favor of the wife, the daughter and her children, should all fail prior to the time when the policies were to be paid and if the survivor of the wife and daughter should leave no will. In Commissioner v. Bayne's Estate, 2 Cir., 155 F.2d 475, we held that a reversion in the grantor's estate by operation of law predicated upon the latter's dying without descendants and without brothers and sisters who had left descendants rendered the whole trust includible in the grantor's gross estate. However, the mere possibility of reverter arising solely by the operation of the laws of intestacy if the decedent survived issue who came into being during his lifetime and who died without leaving a will and without other heirs at law, may be considered too remote and unsubstantial to render the property transferred subject to inclusion in the estate of the decedent. Indeed, that may be the conclusion suggested by the Supreme Court in Goldstone v. United States, 325 U.S. 687, 693 ftn. 3, 65 S.Ct. 1323, 89 L.Ed. 1871, 159 A.L.R. 1330. For that reason we prefer to rest our holding in the case at bar upon the view that the transfer was made in contemplation of death.

█ The trial court held that Schustek was in good health at the time the policies were transferred but that his preponderant motive in making the transfers was avoidance of estate taxes, and that the transfers were made in contemplation of death within the meaning of Section 302(c) of the Revenue Act of 1926, as amended, 26 U.S.C.A. Int.Rev.Code. § 811(c). These grounds sufficed to bring all twelve policies

into the estate of the decedent for purposes of taxation and to justify the dismissal of the complaint in the present action.

It may be that if the donor had parted with all control over the Mutual policies the gift of them would not have been in contemplation of death merely because he thought he could thus escape estate taxes. But though he did put his wife in control of the policies she did nothing to exercise control and the letter of his broker, which we have quoted, indicates that it was arranged that the policies were to remain available for the husband's use—in other words, that his wife should use her power to borrow money on them at the request of the donor and for his benefit. If such an arrangement as suggested in the letter was not in fact made the plaintiffs had the burden of disproving it. The situation, therefore, closely resembles the one we dealt with in Vanderlip v. Commissioner, 2 Cir., 155 F.2d 152, cert. den. October 14, 1946, 67 S. Ct. 183. We have what is analogous to a life estate in the donor with remainder over to his wife or issue. Upon such a hypothesis his only reason for not disposing of the policies by will would be to avoid estate taxes. It would be a mere substitute for a testamentary disposition.

It is argued that the statements of the decedent's purpose contained in the letter of his broker were incompetent evidence against the plaintiffs. This we do not think sound law. The broker was authorized to arrange for the settlements with the companies. It is a most technical view of the situation that his explanations of the transaction, which might well affect the details of the transfer, were not competent evidence. To place the policies within his wife's legal control while at the same time subjecting them to equitable rights on his part would be the way to avoid estate taxes that involved the least risk and was probably the way selected for that reason. We hold that the evidence objected to was competent. New Jersey Steamboat Co. v. Brockett, 121 U.S. 637, 648, 649, 7 S.Ct. 1039, 30 L.Ed. 1049; United States v. Gooding, 12 Wheat. 460, 467, 6 L.Ed. 693. It would be strange to have a rule of agency binding a principal to unauthorized acts of an agent, when done within the apparent scope of his authority, and yet to adopt a rule of evidence which would exclude statements naturally made in the course of the agency. Such a rigid view does not accord with the current broadening of the rules of evidence or with the spirit of contemporary remedial statutes.[1]

For the foregoing reasons the judgment dismissing the complaint is affirmed.

FRANK, Circuit Judge (concurring).

I think it well to indicate my understanding that the ruling here as to the admissibility of the broker's letter, relying as that ruling does in part on the New York "course of business" statute, does not involve a repudiation of Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645, 144 A.L.R. 719, affirming our ruling in Hoffman v. Palmer, 2 Cir., 129 F.2d 976. In that case, an employee's statement, offered in evidence on behalf of (not against) his employer, was held inadmissible under the similarly worded federal statute, because the alleged "course of business" was such as obviously to make for (not against) untrustworthiness.[2] See Buckminster's Es-

---

[1] Rule 43 (a), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. See also Civil Practice Act of the State of New York: § 374-a provides for the admissibility in evidence of any writing or record made as a memorandum or record of any act, transaction, occurrence or event as proof of said act, transaction, occurrence or event, if the trial judge shall find that it was made in the regular course of any business. The term "business" includes business, profession, occupation and calling of every kind. Cf. also § 340 of the Civil Practice Act of New York. That section provides for the competency of any admission by a member of an aggregate corporation, who is not a party, against the corporation if it was made concerning and while engaged in a transaction in which he was the authorized agent of the corporation. The principle would seem to be applicable to the situation at bar though the latter involves a non-corporate principal.

[2] The employer required every employee, involved in an accident, promptly to make a written statement as to the accident; patently the statements were to aid the employer if litigation ensued, and were highly likely to be biased in favor of the employer.

tate v. Commissioner, 2 Cir., 147 F.2d 331, 334. As suggested in our opinion in the Palmer case, the New York courts would probably be no more latitudinarian in their interpretation of the New York legislation.

No sensible person can doubt that the hearsay rule seriously impedes the achievement of a major purpose of any sensible trial procedure, that of having the trial court come as close as possible to the actual facts of a case.[3] It would therefore be highly desirable if the rule were abandoned in jury-less cases and if, in jury cases, it went no further than to give the trial judge discretion to exclude hearsay when he thinks the jury cannot intelligently handle it.[4] But so deeply is that rule embedded in our traditions that I think courts should not thus virtually abolish it without legislative authorization.

Nevertheless, moderate judicial modifications of the rule seem to be justified by Supreme Court decisions. It is fair to assume, too, that the New York courts, within modest limits, would, as we do here, extend their statutes by analogy. Cardozo, J., spoke of a "legislative policy which is itself a source of law, a new generative impulse transmitted to the legal system." Van

Beeck v. Sabine Towing Co., 300 U.S. 342, 351, 57 S.Ct. 452, 456, 81 L.Ed. 685. No matter what may be its early history,[5] something like the doctrine of the "equity of a statute" (i.e., the doctrine that the courts should somewhat liberally apply the policy expressed in legislation to meet the "mischief" at which it aims) has been given considerable vitality in recent years.[6]

---

3 The ascertainment of the facts of a case is difficult enough without such impediments: As the actual "objective" facts are past events, the trial court can seldom be entirely sure of accurately knowing them; since the facts, for purposes of a court's decision, consist of the belief of the trial judge or jury about those past events, the facts are "subjective" not "objective." See In the Matter of Fried, 2 Cir., 161 F.2d 453.

That even Supreme Court Justices, when completely agreeing on the pertinent legal rule, may, when considering the evidence without any previous finding by a lower court, sharply disagree about the facts (i. e., the inferences to be drawn from conflicting testimony), see United States v. Shipp, 214 U.S. 386, 29 S.Ct. 637, 53 L.Ed. 1041.

4 See A. L. I. Code of Evidence.

There may be a question whether such a proposed rule would not, in criminal cases, sometimes transgress the constitutional requirement of confrontation, in which event, to that extent, the modified rule would perhaps be unconstitutional.

5 For differing views about this history, see, e. g., Thorne's introduction to A Discourse Upon the Statutes (1942); Radin, Early Statutory Interpretation in Eng-

land, 37 Ill.L.R. (1943) 16; Landis, Statutes and The Sources of Law, in Harvard Legal Essays (1934) 213; De Sloovere, The Equity and Reason of a Statute, 21 Corn.L.Q. (1936) 591; Goebel, Cases and Materials on The Development of Legal Institutions (1937) 747, 748; Davies, The Interpretation of Statutes, 35 Col.L.R. (1935) 518; cf. Stone, The Common Law in the United States, 50 Harv.L.R. (1936) 4, 13, 14.

6 Gooch v. Oregon Short Line R. Co., 258 U.S. 22, 24, 42 S.Ct. 192, 66 L.Ed. 443; Johnson v. United States, 1 Cir., 163 F. 30, 32, 18 L.R.A.,N.S., 1194; United States v. Hutcheson, 312 U.S. 219, 235, 61 S.Ct. 463, 85 L.Ed. 788; South & Central American Commercial Co. v. Panama R. R. Co., 237 N.Y. 287, 291, 142 N.E. 666; Paul, Estate and Gift Taxation (1942) §§ 1.08 and 1.12.

A similar recent development in England is noted by Friedman, Legal Theory (1944) 259–262, citing Plowden's comments on Eyston v. Studd (1574), 2 Plowden 459, 468 (75 Eng.Rep. 688, 699). He regards this development as, in effect, a revival of the doctrine of the "equity of a statute"; see Book Review, 59 Harv.L.R. (1946) 1004, 1006.