## COMMISSIONER OF INTERNAL REVENUE v. ICKELHEIMER.

### No. 69.

Circuit Court of Appeals, Second Circuit.

Jan. 5, 1943.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Helen R. Carloss, and Robert R. Barrett, Sp. Assts. to the Atty. Gen., for petitioner.

Leon Lauterstein, Montgomery B. Angell, and Jesse B. Spiller, all of New York City, for respondent.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

SWAN, Circuit Judge.

In 1935 and 1936 the taxpayer purchased on the New York Stock Exchange, through a brokerage firm of which her husband was a member, certain bonds of the face value of $100,000. The bonds were paid for by her and were thereafter carried in the safe-custody account which she maintained with the brokerage firm. On various days during the latter part of September 1937 her husband, acting on her behalf under a general power of attorney, caused her bonds to be sold for less than their cost in order that she might take the loss in computing her 1937 income tax. The orders for these sales were given to the husband's brokerage firm and by that firm were executed on the New York Stock Exchange in the regular manner; and the proceeds from the sales, $14,910.86, were credited to the taxpayer's personal account on the broker's books. The taxpayer's husband was one of three trustees of a trust set up by her father in 1920, under which she was life beneficiary and donee of a special power of appointment. On the day following a sale of bonds of the taxpayer (or, in one instance, two days later) the husband, acting on behalf of the trust, purchased a like number of bonds of the same issue. The bonds were purchased for the trust at a cost of $15,303.75 through the husband's brokerage firm, the orders for purchase being executed by that firm on the New York Stock Exchange in the regular manner. The trust maintained a current account with the broker and the cost of the bonds was charged

to the account of the trust which had ample funds to pay for them. The bonds were then placed in the safe-custody account of the trust. Of the 100 bonds purchased four bore the same serial numbers as bonds sold by the taxpayer. Before the sales and purchases were made, the husband had been advised by counsel that a loss deduction might be taken by the taxpayer despite the purchase a day later of similar securities by the trust. The Tax Court held that the loss realized by the taxpayer on the sale of her bonds was an allowable deduction against her gross income in 1937. The correctness of this ruling is the sole issue presented.

■ Section 301 of the Revenue Act of 1937, 50 Stat. 827, 26 U.S.C.A. Int.Rev. Code, § 24(b), amending section 24(a) of the Act of 1936, provides that "in computing net income no deduction shall in any case be allowed in respect of losses from sales or exchanges of property, directly or indirectly—* * * (F) Between a fiduciary of a trust and a beneficiary of such trust." The Commissioner concedes that there was no direct sale between the taxpayer and the trust of which she was a beneficiary, but argues that since the husband acted for his wife in making the sales and for the trust in making the purchases, the sales must be considered as "indirectly" made "between" her and the trust. We think not. The sales completely divested the taxpayer of any interest in the bonds and passed title thereto to unknown purchasers. There was no agreement between her and her husband or between the husband and the undisclosed purchasers from her that the trust would buy what she sold or that she should sell to enable the trust to buy. Indeed, it is apparent that the trust could have purchased 96 of the 100 bonds bought for it even if she had not sold, and as to the 4 bonds which she had formerly owned it was mere accident that the trust later acquired them rather than others. The most that can be said is that when the sales were made the husband entertained an intention to purchase similar securities for the trust; but there was nothing to prevent him from changing his mind. Had there been a sudden fall in the value of the bonds his fiduciary duties as a trustee would have required him to change his intention to buy them. Both sales and purchases were completely at the risk of the market, and, though the variation happened to be slight, the cost price to the trust was not the same as the sales price of the taxpayer. It is clear that the transactions do not fall within the letter of the statute.

■■ Nor do we think they were such as the purpose of the statute sought to embrace. The purpose was to disallow losses incurred in transactions which were not "definitely at arms length." See 81 Cong. Rec. 9019. Sales between members of a family were often not real transactions but it was not easy for the Commissioner to prove them sham. Indirect sales through a friend or dummy were also not uncommon. The restriction on losses first introduced in section 24 of the 1934 Act was intended to meet these evidentiary difficulties. See 78 Cong.Rec. 2662. Congress did not express, and we see no reason to suppose that it entertained, any intention to disallow losses realized by bona fide sales on a public exchange. Under prior revenue acts such a sale entitled the seller to a deduction despite a contemporaneous purchase on the exchange of similar securities by a member of the seller's family. Commissioner v. Behan, 2 Cir., 90 F.2d 609. His purchase does not make the prior sale one indirectly between the parties. Had Congress intended to strike down losses realized by a bona fide sale executed on a public exchange in case a member of the seller's family should purchase similar securities shortly thereafter, we think language more apt for the purpose would have been employed. The 1937 amendment, by including sales between a trust and a beneficiary of such trust, extended the class of persons affected by the 1934 restriction but did not change the character of transactions to which it applied. Cf. 55 Harv.L.Rev. 872. The order is affirmed.

L. HAND, Circuit Judge (dissenting).

Section 301 of the Act of 1937 forbade the deduction of losses realized by means of sales made between persons in certain specified relations. It had been found that such sales were often only colorable; the buyer would hold the goods for the seller's benefit while the seller deducted the loss. Since it was difficult to tell when the sale was real and when it was sham, Congress banned deductions realized upon all such sales, incidentally depriving many real sellers of the privilege of deducting their losses. The question before us is

whether the words, "sales or exchanges * * * directly or indirectly," read in the light of this purpose, cover the transaction described by Judge SWAN. I concede that for most purposes and in the ordinary sense there was no sale at all; the seller did not transfer the goods to the buyer, but to unknown buyers other than he; the buyer did not pay the money to the seller, but to unknown sellers other than she; there was not even one price, strictly speaking, though the variation between the buying and selling prices did not count practically. Still I think that there was an "indirect sale" within the meaning of § 301. Suppose—to take a nearer instance—that the buying and selling orders had been put in at the same time. It would still be true that there were two transactions; a sale to one set of persons, and a purchase from another; and the prices would also almost certainly have varied to some extent, if only because of the commissions, taxes and the like. Yet, one would have to be a very convinced literalist to say that the section did not cover a device by which the plain purpose of the statute could be frustrated, and by which that inquiry would become inevitable which it wished to avoid. Unless we must confine "indirectly" to cases where the seller passes title to an intermediary who has agreed to pass it to the ultimate buyer at the same price, we should call such a transaction an "indirect sale." I can see no reason so to confine it.

That is not of course the transaction before us, for the buyer waited a day—in one case two—and he was not bound to buy if in the meantime the price went up enough to make the bonds no longer a good investment. But neither of these circumstances, nor both together, make a valid distinction, when as here the purchase has been arranged as a correlative of the sale, and when it in fact goes through; for at the end of their series of steps the parties have succeeded in putting themselves in substantially the same position as though they had dealt directly with each other. The "wash sales" section—§

118 of the Act of 1936, 26 U.S.C.A. Int.Rev. Code § 118—shows that Congress did not regard the chance taken by an investor who sold and rebought within thirty days, as enough of a break in his ownership to "realize" a loss; the situation here is somewhat like that. I submit that in § 301 it does no undue violence to the natural meaning of the words to describe these two transactions here as together constituting an "indirect sale"; else the evasion becomes almost as easy as though the orders were put in at the same time. Nor do I feel embarrassment in making the sale depend upon whether the buyer buys, at least if he buys at substantially the same price. I should not for example hesitate to call it an "indirect sale" between husband and wife, if she were to sell Whiteacre to a third person but give her husband an option to take it over at the same price.

Compunctions about judicial legislation are right enough as long as we have any genuine doubt as to the breadth of the legislature's intent; and no doubt the most important single factor in ascertaining its intent is the words it employs. But the colloquial words of a statute have not the fixed and artificial content of scientific symbols; they have a penumbra, a dim fringe, a connotation, for they express an attitude of will, into which it is our duty to penetrate and which we must enforce ungrudgingly when we can ascertain it, regardless of imprecision in its expression. Johnson v. United States, 1 Cir., 163 F. 30, 32. Here we can have no doubt of the purpose, of what Congress was aiming at; and that, I submit, we truncate, if we do not include transactions by which, in accordance with a preexisting design, property passes by whatever combination of moves at a substantially unchanged price from one member to the other of any of the specified pairs. Finally there is no difference between on the one hand, selling units of fungibles and buying other units, and on the other the sale of single units. That seems so obvious that I shall not labor the point; once more § 118 of the Act of 1936 is an apt analogy.