## In re V. LOEWER'S GAMBRINUS BREWERY CO.

District Court, S. D. New York.

May 7, 1947.

See also 58 F.Supp. 520.

Finke & Jacobs, of New York City (Marcy Finke, of New York City, of counsel), for claimant-petitioner.

Glass & Lynch, of New York City (Leslie Kirsch and Sidney Freiberg, both of New York City, of counsel), for trustee.

BRIGHT, District Judge.

Loewer Realty Company petitions for a review of an order made by the Honorable John J. Joyce, referee in bankruptcy, subordinating its claim for $48,138.39, to the claims of all other creditors of the estate.

Claimant on April 20, 1943, filed proof of claim in the sum of $49,519.63, of which $45,000 was represented by a promissory note dated March 28, 1941, $2700 interest thereon, and $1819.63 for rent. Objection was filed by the trustee on November 28, 1944, on the ground that the debtor was not justly and truly indebted to the claimant. A bill of particulars was thereafter furnished which stated that the rental agreement was oral and was made on or about February 12, 1930, by Jacob Loewer, Henry D. Muller, Sr. and Ida Loewer, president, treasurer and secretary respectively of the claimant, with the board of directors of defendant, as then constituted, the names of whom were not known to claimant. The rental claim was for the use of the premises at 536–38 West 41st Street, New York City, at $3750 per annum ($312.50 per month), 540–542 West 41st Street, at $1250 per annum ($104.16 per month) and 535 West 40th Street at $1875 per annum ($156.25 per month). ¡Upon the trial, the 'claim was amended by reducing the amount to $48,138.39 and substituting the premises 536–42 West 41st Street as those for which rent was sought.

The referee found the following facts, which do not seem to be disputed:

The debtor was engaged in the manufacture and sale of beer and owned 528–532 West 42nd Street, where it had its office, and 521–523 West 41st Street, which it used as a brewery and for cold storage. Claimant was the record owner of 536–538 West 41st Street, which were used by the debtor as a bottling plant and garage respectively.

Prior to 1923 and at all times thereafter, the debtor and claimant each had the same officers, directors, and stockholders; the two corporations kept separate books and bank accounts, but had common office space and telephone facilities in the building owned by the debtor, whose office manager kept claimant's books without charge, and when other employees of the debtor performed service for the claimant, except the president who received a nominal salary from the claimant, they were paid only by the debtor. All transactions between claimant and debtor were conducted, approved and effected through the same group of officers, directors or stockholders; and

each of the corporations was an integral part of an enterprise owned, controlled and directed by the same group of persons as stockholders for their own benefit; and moneys and property of each corporation were applied under the direction of the stockholders for the benefit of the other as a branch or department of a joint enterprise owned and controlled by the same persons for their own benefit.

It was also found that the note underlying part of the claim bears date March 28, 1941, and was made in the debtor's name by Kenneth P. Steinreich, as president and Henry D. Muller, as treasurer, and both were similar officers of the claimant. It was entered in the debtor's general ledger on May 31, 1941, and was executed as evidence of a purported indebtedness comprising (1) a loan account commencing in January 1923, and (2) a rental account commencing in May 1928.

The credit balance in favor of claimant was $35,154 at the end of each of the years 1935, 1936 and 1937. After 1935, the claimant was not credited with any loan but in 1941 was credited in the amount of $2,000, the character of which does not appear; and no other entries except for interest appear in the loan account after 1935.

It was further found that in 1932 claimant's three directors passed a resolution which recited that the two corporations were owned by the same individuals and were affiliated companies in fact, and directed its officers to assign its claim against the debtor to a bank as security for repayment of moneys borrowed by the debtor. At a joint meeting of stockholders of both corporations, held May 18, 1933, it was resolved that all of the assets of the respective companies, with certain exceptions, be sold, upon terms of sale to be fixed by the president, either by a direct sale or by transfer of assets to the stockholders and sale by them, or by transfer of the capital stock to the purchasers, or in such other manner as might be calculated to avoid or reduce taxes; and at a similar meeting on September 18, 1933, they considered a conditional offer by a prospective purchaser for such assets. On December 13, 1940, the stockholders of each corporation adopted separate but identical resolutions that the directors be instructed to receive and consider a proposal to purchase all the property of both corporations.

On December 3, 1940, the *debtor's* stockholders authorized a mortgage for $20,000 upon the 42nd Street property, the proceeds of which were to be applied to the discharge of all arrears of taxes, mortgage interest and other charges against the *claimant's* property; and out of the proceeds of that loan, the debtor on December 31, 1940, paid $5,671.33 taxes on the claimant's property at 530–538 West 41st Street, $3,973.75 for interest on a mortgage on part of those premises, and $1361.25 on mortgages covering the property.

On January 27, 1941, the debtor's directors authorized the sale of realty in Far Rockaway, the title to which was in the name of the claimant, and on the same day the same persons as directors of the claimant, adopted an identical resolution.

On April 25, 1941, the debtor's stockholders rejected a written proposal for an exclusive authorization to dispose of all of the realty between 40th and 42nd Streets and 10th and 11th Avenues, for a fixed sum, and on the same day, the same as stockholders of the claimant adopted a resolution that claimant combine with the debtor in negotiating a mortgage loan on the properties of both corporations. On November 24, 1941, the stockholders of both corporations at a joint meeting granted one stockholder an exclusive agency for two weeks to negotiate the sale of the assets of both corporations; and at their adjourned meeting on December 2, 1941, instructed the officers and directors of "the corporation," in the event a contract of the sale was executed, to make other arrangements for the continuance of the brewery.

It was also found that the debtor, in conjunction with Monarch Beer Sales Corp., a wholly owned subsidiary, sustained net losses amounting to $5,373 for the first quarter of 1934, $4,000 for 1935, $48,000 for 1937, $14,000 for 1938 and $70,000 for 1940. And at the annual meeting of the debtor's stockholders on March 28, 1941, the date of the promissory note, the vice president reported that the debtor lost $70,000 in

1940, that creditors were then, or at the time the mortgage was negotiated on December 3, 1940, about at the end of their patience, and that the bank was not aware of the debtor's serious situation.

Upon these findings of fact, the referee concluded that claimant was a mere adjunct and instrumentality of the debtor; a part of the stockholders' own enterprise; in equity was not entitled to have its claim allowed on a parity with the claims of other creditors; and such claim should be subordinated to all other creditors.

The referee in his opinion, wrote that ordinarily the corporate entity would be recognized unless necessary to circumvent or redress fraud; finds that no fraud was proven; that fraud need not be shown where it is obvious that the stockholders considered and treated the properties of both corporations as parts of a single enterprise, each corporation being a branch or department of that enterprise; and that under the equitable powers of the court in bankruptcy and under the circumstances shown here, it was his duty to subordinate the claim, especially when its allowance would accrue to the benefit of the common officers, directors or stockholders. He felt reenforced in that determination because it seemed obvious that there was no intent on the part of one to collect from the other.

An examination of the record reveals other details which are not specifically found by the referee. There was some testimony that the note of March 28, 1941, was the successor of other notes which had been cancelled after the signatures had been taken off and had then been filed in the debtor's safe. These notes were not produced and an examination of the ledgers of the debtor does not show that they ever existed. Although there are pages of notes payable and of alleged transactions with the Realty Company, nothing is shown in the books of account of the existence of any note or notes to the Realty Company. The first mention in the books of any note is of the one introduced in evidence. The balance sheets from the end of 1933 to the end of 1940 do not mention any such note, although other notes payable are listed among the liabilities. The testimony of the accountant who audited the books from 1933 to the end of 1940 states that his balance sheets show two items of notes payable, one to banks and the other secured by life insurance, neither of which included the note payable to the Realty Company; that if the books had shown such a note, it would have been set forth on the balance sheets; and so far as he knew, there was no such note. As a matter of fact, the note was signed by Kenneth P. Steinreich as president. He was not then the president and was not elected as such until some time later. He was then the executive vice president, and it appears from the testimony that his authority, as vice president, to sign any note had expired.

The alleged lease was not discovered or brought to light until January 23, 1946, when it was produced by an attorney who had acted as such for the company for some thirty years prior to 1940. It was found in his possession, although he had not been attorney for either of the companies since 1940. The one introduced in evidence bears date June 1, 1941. There was no explanation how it came into his possession, and he testified that he had no recollection of ever having seen it before. It is signed by Kenneth P. Steinreich as president of the Realty Company, but is acknowledged by him as president of the Brewery Company. It is signed for the Brewery Company by Henry D. Muller, III as Treasurer and not acknowledged. It has the appearance of having been drawn at the Brewery and not by an attorney. From its appearance it would not seem that any attorney supervised its execution. The proof of claim by the Realty Company verified April 19, 1943, contains the express statement, "That upon information and belief, the rent due claimant is not founded upon a written lease"; and as a matter of fact, makes claim for rent for premises located at 548 West 42nd Street, New York City, which building the Realty Company did not own but which was the property of the Brewery. Muller, an officer and director of both companies testified that as far back as he could remember, there was no lease for the payment of the rent claimed; and even after the lease had been introduced while he was testifying he further stated that in December, 1945, he

did not have any possession or knowledge of a written lease between the two companies.

It was not shown that there were ever any payments made by either corporation to the other; in fact, nothing was shown, other than the mere entries in the books of account, as to the authenticity of the debits and credits therein contained. And the amount due the Realty Company was swollen by the compounding of interest monthly on the amounts due. The account itself was discredited by other testimony. On December 31, 1940, the mortgage for $20,000 authorized at the meeting of December 3, 1940, previously mentioned, was made by the Brewery Company to the Franklin Savings Bank upon Brewery Company property. None of the payments aggregating $11,006.33, mentioned in the findings, made from the proceeds of that mortgage upon the obligation of the Realty Company, were credited to the Brewery Company either in the rent account or in the loan account.

It is clear that the note and lease were brought into being to lend some seeming authenticity to the alleged claim of the Realty Company against the Brewery Company, and for the additional reason, as testified to by the former treasurer of both companies with reference to the note, "for the protection of the stockholders involved." Although there was an annual meeting of directors on the same day that the note was made, no specific reference is made to the note nor with reference to the execution of the lease. And all of this was done when the company was incurring large deficits and when corporate finances were in a critical condition. It was shown that at the annual meeting of the company held on March 28, 1941, the date of the note, Mr. Steinreich reported that the financial structure was weak, that the year of 1940 showed a loss of $70,858.37, and that the latest report of Dun & Bradstreet read, "Comparative fiscal statements for a like period have reflected an unbalanced financial condition, a growing current debt and a substantial deficit." Mr. Steinreich further reported, "Creditors were about at the end of their patience and the bank was not aware of the seriousness of our situation, as Mr. Loewer had kept the details of this critical situation to himself." The books show that at the end of 1933 the deficit was $245,152.10, at the end of March 1934, $252,460.89, at the end of 1935 $213,355.86, at the end of 1937 $241,006.33, at the end of 1938 $259,583.81 and at the end of 1939 $259,297.26. The Brewery had operated at a loss of $6.47 in 1933, of $5,373.34 in 1934, $4,015.51 in 1935, $48,061.70 in 1937, and $14,835.57 in 1938.

It is stated in the claimant's brief that there is no conflicting evidence as to the contents of the papers, documents, records and minute books, and that the facts are substantially undisputed. Its petition for a review does not question or except to any finding of fact. The errors alleged relate solely to conclusions of law and to statements made by the referee in his opinion.

Starting with that premise, as I do, apparently the only question remaining is one of law, and that is whether or not equitable considerations under the facts found require or justify the subordination of this claim to the claims of all other creditors.

 The corporate entity is not sacred, and will not be recognized when to do so would work fraud or injustice. And subordination of claims is an established remedy where equitable principles require its application. Taylor v. Standard 'Gas & Electric Co., 306 U.S. 307, 322, 618, 59 S.Ct. 543, 83 L.Ed. 669. These equitable powers, inherent in bankruptcy courts, have been invoked to the end that fraud will not prevail, that substance will not give way to form, and that technical considerations will not prevent substantial justice from being done. They have been applied in passing upon claims presented by officers, directors or stockholders, whose dealings with the corporation are subjected to rigorous scrutiny; and where such claims are challenged, the burden is on the stockholder not only to prove good faith in the transaction but also to show inherent fairness from the viewpoint of the corporation and those interested therein. The essence of the test is whether or not under all of the circumstances the transaction carries the ear marks of an arm's length bargain.

914

If it does not, equity will set it aside. That standard of fiduciary obligation is designed for the protection of creditors as well as stockholders. A consideration in the determination of such equities is whether or not the claims have been permitted to lie dormant for years and are sought to be enforced only when the debtor corporation is in financial difficulty. Pepper v. Litton, 308 U.S. 295, 304, 305, 306, 307 and 311, 60 S.Ct. 238, 84 L.Ed. 281. It is, of course, recognized that in liquidations distribution should be made by dividends of an equal percentum of allowed claims of creditors; but balanced against this is the right to subordinate where the conduct of a claimant is contrary to established equity principles. Prudence Realization Corp. v. Geist, 316 U.S. 89, 93, 62 S.Ct. 978, 86 L.Ed. 1293. Mere legal paraphernalia will not suffice to transform into a substantially adverse claimant a "corporation whose affairs are so closely assimilated to the affairs of the dominant stockholder that in substance it is little more than his corporate pocket." Sampsell v. Imperial Paper & Color Corp., 313 U.S. 215, 218, 61 S.Ct. 904, 907, 85 L.Ed. 1293. Much the same problem is approached from another angle in Re Hicks & Son, 82 F.2d 277, 279, where an order expunging a claim was affirmed, and the Second Circuit wrote, in part:

"Nevertheless, it appears to us that the lease and the loan did not create any obligation at the outset; that they were mere forms, intended never to become binding on the companies, and for that reason never contracts. * * *

"A contract between two companies all of whose shares are held by a single shareholder, in a fundamental sense cannot create an obligation, for an obligation implies a power in one person to control, to coerce, the will of another, and there is only one will concerned."

While these cases are not entirely analogous in point of fact, they amply sustain the equitable principles stated, and with the facts found and otherwise appearing, justify, in my opinion, the conclusion arrived at by the referee that claimant was a mere adjunct or instrumentality of the debtor, a part of the joint stockholders' enterprise, and that the claim should be subordinated. His conclusion is affirmed for the reasons stated by him in his opinion and under the cases therein cited. The petition for review is, therefore, dismissed.