### SCHWARTZ v. MILLS.
No. 22, Docket 22036.

United States Court of Appeals Second Circuit.

Argued Oct. 5, 1951.

Decided Nov. 15, 1951.

Frank, Circuit Judge, dissented.

Joseph Lewis Simon, of New York City (Rubin Cohen, of New York City, on the brief), for petitioning creditor-appellant.

N. William Welling, of New York City, for appellee.

Before SWAN, Chief Judge, and CLARK and FRANK, Circuit Judges.

CLARK, Circuit Judge.

This appeal attacks the validity of the appointment of a trustee in bankruptcy made by a referee on failure of choice by the creditors. An objecting creditor challenged the right of another claimant to vote, and repeats the challenge here after denial of his petition for review, and affirmance of the referee's action, by the district court.

The bankrupt is Grade A Foods Corp., which was adjudicated on a petition filed December 22, 1950, by appellant and other

creditors. The first creditors' meeting was held on February 20, 1951. Some eight creditors appeared, presenting claims of about $100,000. Of this, $93,000 however, was made up of the claim presented for New York Meat Packing Co., Inc., by Schneider, its president and fifty per cent stockholder, who was likewise president and half owner of the bankrupt Grade A. Over the objections of other creditors, the referee permitted this claim to be voted in the election of the trustee; and in consequence neither of the two candidates being voted upon received the necessary majority in both number and amount of claims, as required by § 56 of the Bankruptcy Act, 11 U.S.C.A. § 92. Thereupon the referee chose the trustee in the person of Henry A. Mills, who had been serving as receiver under appointment by the district court and who was also the nominee of the New York Meat interests. All parties agreed that Mills was both qualified and disinterested. Nonetheless this creditor sought review by the district court and, losing there, now appeals to us.

■ Petitioner's first contention relies upon the facts that both New York Meat and Grade A are family corporations, owned and controlled by the same individuals, that their offices are located in the same building, and that the business affairs of each have been dominated by a long tradition of intercompany transactions. He therefore argues that even though New York Meat does not directly own Grade A stock, it is nevertheless within the disfranchising provision added to § 44, sub. a, of the Act, 11 U.S.C. § 72, sub. a, by the Chandler Amendments of 1938. That section in its presently important part now provides that the creditors of a bankrupt, "exclusive of the bankrupt's relatives or, where the bankrupt is a corporation, exclusive of its stockholders or members, its officers, and the members of its board of directors or trustees or of other similar controlling bodies," shall appoint a trustee, with provision for appointment by the court if the creditors fail to act. This quoted language thus employed to overturn the older tradition which allowed these classes to vote in the election of a trustee seems to us notably clear and explicit. It refers primarily to individuals, since a corporation cannot be a relative, officer, or director of the bankrupt. It also is limited to stockholders of the bankrupt. Thus the language of the statute would appear to be inapplicable to New York Meat, the claimant corporation. West Hills Memorial Park v. Doneca, 9 Cir., 131 F.2d 374, 376.

■ But petitioner seeks to go behind the corporate form, citing Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281, and Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669. It is of course true that bankruptcy courts can and must pierce the proverbial corporate veil in the interests of substantial justice to subordinate the claims of corporate affiliates or individual insiders who have obtained an unfair advantage from their favored position. But we do not think that the doctrines expressed in such cases cover the situation at bar. For subordination is not mechanically automatic upon the showing of identity between the stockholders and officers of the claimant and debtor corporations; we have traditionally stressed the elements of fraud and actual injury to the debtor interests, and have thus held that mere illegality under the antitrust laws in the purchase of a claim would not require subordination. West 52nd Theatre Co. v. Tyler, 2 Cir., 178 F.2d 128. Petitioner here has given no hint even of fraudulent conveyance, manufactured claim, or mismanagement. Further he makes no objection on the broad equity ground that this election is bankrupt controlled, a valid ground for reversal had proof in support been adduced. In re McGill, 6 Cir., 106 F. 57, 62. It is true that in In re Loewer's Gambrinus Brewery Co., 2 Cir., 167 F.2d 318, this court affirmed D.C.S.D.N.Y., 74 F.Supp. 909, to hold, after a full trial upon objections filed by the trustee, that a claim of a solvent corporation having the same stockholders as the debtor should be subordinated to the claims of other creditors. But this was not stated as an absolute rule of law, to be applied notwithstanding the injustice it might cause, as would be the case where the creditor corporation was itself insolvent and its

own creditors thus prejudiced. On the contrary, the first opinion in the report of the case expressly eliminates the situation where creditors of the creditor corporation show that they are adversely affected; the concurring opinion is clearly of like tenor; while the third judge merely concurs in the particular result.

Even where subordination on equitable grounds appears indicated, a judgment without reservation to this effect at the outset is of dubious efficacy, "because it is based on a state of affairs as of a particular time and invites multiplicity and renewal of litigation if and as the administration progresses toward solvency. It is a temporary solution only." 3 Collier on Bankruptcy 187, 14th Ed. 1941. Moreover, it would serve to inject a troublesome issue into initial proceedings whose purpose is to elect a court fiduciary who can proceed expeditiously to the conserving of the estate and the careful scrutiny and, if need be, rejection of claims presented. At least there must result a considerable trial where other equities, if any, would need exploration; thus the trustee now asserts that pursuant to direction of the referee he has brought suit to recover an alleged preferential payment from the bankrupt to one of those voting for petitioner's nominee. Since a trustee should not owe his election to those whom he must sue for restoration of the bankrupt's estate, In re Stowe, D.C.N.D.Cal., 235 F. 463; In re Anson Mercantile Co., D.C.N.D.Tex., 185 F. 993, this issue would clearly require adjudication before subordination can be settled. But surely when circumstances indicate that subordination would be unjust there should be no such delay and trial. That is the case here. For there was pending at the time a petition to force New York Meat into insolvency; and it now appears to be in voluntary reorganization in Chapter X proceedings. Hence subordination would be distinctly unfair to its creditors.

Next petitioner contends that even if New York Meat is not thus disqualified from voting, its Proof of Claim failed to satisfy the requirements of § 57, sub. a, 11 U.S.C.A. § 93, sub. a, which specifies a statement under oath "setting forth the claim" and "the consideration therefor." New York Meat's claim, filed in accepted form, described the consideration for the debt as "money loaned and borrowed by the Alleged Bankrupt from the Claimant, goods, wares and merchandise sold and delivered to the said Bankrupt" at the latter's special instance and request.

Some of the older cases do speak in terms of a detailed statement, compiled "with meticulous care," of the consideration for the claim. See cases cited in 3 Collier on Bankruptcy 127, 128, 14th Ed. 1941. Without considering whether or not such exacting requirements can have any real meaning in the day-to-day realities of creditors' meetings, we think the better rule is that no error will lie if there was reasonable ground for the allowance. See In re Rosenfeld-Goldman Co., D.C.Mass., 228 F. 921. Hence a Proof of Claim should be held to comply with the requirement for statement of the consideration if the creditors and trustees are thereby supplied with enough information as to the circumstances giving rise to the debt to be able to test and pass on its validity, legality, and substantial accuracy.

Here we think this Proof sufficient under this functional test. It does not appear that the petitioning creditors or later the trustee were actually harmed or misled by the succinctness of the statement. Any deficiency in knowledge was in fact supplied during the creditors' meeting. Schneider testified to his personal knowledge of loans of at least $20,000, or more than sufficient to create the impasse in selection of the trustee. He also testified that the company books showed the bankrupt owed claimant approximately $93,000, the greater part for money loaned, the balance for meat. In addition there was offered the report of accountants for the creditors' committee showing the exact amount claimed as disclosed in the bankrupt's books. This was excluded by the referee without statement of reasons. Had the proceedings resolved themselves into a trial on the merits as to the validity of the claim, such evidence might have been considered hearsay. Under the circum-

stances here, we think it available to supplement the ex parte statement of the Proof of Claim. See West Hills Memorial Park v. Doneca, supra. Petitioner did not assert that no claim at all existed or suggest fraudulent transactions between claimant and the bankrupt. Nor did he request adjournment to make a formal attack upon the claim. Its allowance for the purpose of the vote was therefore not error. Sloan's Furriers v. Bradley, 6 Cir., 146 F. 2d 757.

▆▆▆ Petitioner did request an adjournment on the ground that an involuntary petition against New York Meat was to be tried in three days in the bankruptcy court, and now complains of the referee's refusal to grant his request. His showing of injury was quite attenuated at best; it was apparently based on the hope that the proceedings would result in an adjudication, followed by the appointment of a trustee who would vote with him. It appears that in fact the trial never occurred, and New York Meat subsequently filed a voluntary petition for reorganization under Chapter X of the Act. 11 U.S.C.A. § 501 et seq. Refusal to adjourn a creditors' meeting is error only when there has been such a serious abuse of discretion as unjustly to prejudice a creditor. See In re Grat, D.C.Mass., 228 F. 925. No prejudice is here shown.

Affirmed.

FRANK, Circuit Judge (dissenting).

1. I think it well to begin by stating the facts somewhat more in detail than my colleagues have done, in order to bring out dramatic aspects of the case to which I think the majority opinion has given insufficient attention. This I do because, although the amounts of assets and liabilities involved are small, the principles are of considerable importance.

The bankrupt, Grade A Foods Corp., had but two stockholders, Schneider and Jacobs, each owning one-half the stock. They owned in exactly that same proportion all the stock of New York Meat Packing Co. Schneider was President of both companies. As President of the Meat Packing Co., he filed on its behalf a $93,000 proof of claim—naming himself as proxy—against the bankrupt company. In the meeting of creditors at which the voting was held, he was examined under oath and testified, first as President of the Meat Co. (concerning its proof of claim), and then as President of the bankrupt (concerning the filing of its schedules). He shifted mercurially from one capacity to another, resembling an actor who "doubles," playing both the hero and the hero's villainous twin brother. Obviously, when he came to vote the Meat Co.'s claim, no one could tell whether his motivation was that of half-owner of the bankrupt or half-owner of a company asserting a creditor's claim. If ever there was an instance of split-personality or dual allegiance, this is it.[1]

Schneider, as proxy, voted the Meat Co.'s $93,000 claim for Mills. All the other creditors objected (on grounds which I shall discuss later) to the voting of this claim. All the other claims, seven in number and aggregating some $6,000, were voted in behalf of one Levy. As the $93,000 Meat Company's claim was the only one of any importance voted for Mills, if that claim could not lawfully vote, Levy was elected. But the Referee held that it had been lawfully voted. As a result, deciding that no one was elected, the Referee appointed Mills, the Meat Company's candidate. I disagree with the Referee. I think that Levy was elected by the seven claims totalling $6,000, and that the Meat Company's claim, voted for Mills, should not have been counted.

In Re Loewers Gambrinus Brewery Co., 2 Cir., 167 F.2d 318, we decided that where —as here—the stockholders of a bankrupt corporation were identical with those of a creditor corporation, then, without any proof of either any kind of fraud or unfair-

---

1. The attorney who had filed an appearance for the bankrupt appeared at the meeting as attorney for the Meat Co. He was allowed to withdraw his appearance for the bankrupt. As attorney for the Meat Co., he significantly referred to it as "the parent company of this subsidiary."

ness whatsoever, the claim of the creditor corporation had to be subordinated to those of all other creditors. In so ruling, we cited and relied on Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281, and Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669; and we "pierced the corporate veil," holding that, in such a situation, the claim of the creditor corporation must be treated exactly as if it were held directly by the stockholders of that corporation.[2]

I am not suggesting, however, that the Meat Company's claim should have been subordinated on the showing made at the time of the voting for the trustee. I cite the Brewery Co. case because there—without the aid of any statute whatever—we considered it necessary to disregard the shadowy corporate insulation. Subordination is indeed harsh. Far less should be needed to penetrate such tissue-paper insulation as we have here, when (1) voting only is in issue and (2) we have a statutory provision—the 1938 Amendment of Section 44, sub. a, 11 U.S.C.A. § 72, sub. a —which aims to prevent those controlling the bankrupt from voting for a trustee. True, the literal language of that statutory provision covers no more than a claim by a bankrupt company's stockholders, directors or officers. But the interpretation of the statute to include a twin corporation carries out its patent purpose, i. e., to disqualify persons with "too close a connection with the bankrupt to make it proper that their votes should be counted in the selec-

tion of the trustee." Analysis of H.R.12889, 74th Cong. 2d Sess. (1936) 157. The amendment was designed by its proponents to exclude "from participation in the appointment of a trustee * * * creditors who are officers or directors of a bankrupt corporation, so that the appointment of a trustee will be the act of persons who are interested in the estate as creditors, and not because of any tie with the bankrupt, personally." Hearings before the House Committee on the Judiciary on H.R. 6439 and H.R. 8046, 75th Cong. 1st Sess. 92.[3]

Some remarks of Walton Hamilton[4] apply here: "A technique known as 'piercing the corporate veil' is now all but universally recognized by the courts. But our artists on the bench are not always adept in locating the covering or in counting the number of veils. * * * There are in the law reports case after case in which it is blandly assumed that if two concerns have separate charters, they are two, not * * * fragments of a larger imperium. * * * Such a decision says in effect, 'get your papers in proper order and we will not go behind the returns.' It is to announce, 'this court deals only with shadows; we have no facilities to deal with substance.'" Hamilton thinks that, in such an instance, a court should "dare to return a human affair to the down-to-earth simplicity it possesses in the everyday world." That is my recipe for the instant case.

My colleagues' only answer is to point to "the language of the statute." That is,

2. In one of the opinions in that case, it was said that there was no need there to consider whether a different result would be required if creditors of the creditor company would be affected. But the other opinion, that of Judge Learned Hand, did not even mention the question.

3. The following excerpt is taken from the testimony of Mr. Hunt, member of the National Bankruptcy Conference which sponsored the 44-a amendment: "The matter has been seriously considered at all of the various meetings of the conference. What we are trying to arrive at is the selection of a person as receiver and trustee who is absolutely impartial, who does not have, as the courts expressed it, *any entangling alliances;* in other words,

a man who is, like Caesar's wife, above suspicion. You have got to have that to have an honest administration. * * * We find that, if we want to have the proper administration, we have got to divorce the bankruptcy from any influence that would tend to minimize the efficiency of administration, and we felt, after due deliberation, that this provision was essential." Hearings before House Committee on the Judiciary on H.R. 6439 and H.R. 8046, 75th Cong. 1st Sess. 94–95.

4. Hamilton, *On The Composition of the Corporate Veil*, an address before the Brandeis Lawyers Society (1946) 18–19, 22.

my colleagues employ the "plain language" rule. Yet I am sure they would not adhere to such mere literalness if called on to construe the following statute (said by Dean Pound[5] to have been enacted some years ago in one of our states): "Be it enacted that it shall be unlawful for any person or persons to discharge any loaded firearm or firearms in, along or upon any public road or highway in this state except for the purpose of killing some noxious or dangerous animal or an officer in the pursuit of his duty." The idea of the inadequacy of the "plain language" as the sole key to correct meaning came into our legal system from Aristotle,[6] via the Roman lawyers,[7] and thence Plowden. Said Plowden (in 1574): "The law may be resembled to a nut, which has a shell and a kernel, and as you will be no better for the nut if you make use only of the shell, so you will receive no benefit of the law, if you rely only upon the letter, and as the fruit and profit of the nut lies in the shell, so the fruit and profit of the law consists in the sense more than the letter."[8] It is, then, a little late in the day for our courts to stick always to the letter of legislation. Particularly is it strange for this court to do so, for our great former Chief Judge, Learned Hand, on and off the bench, has often disclosed the serious unwisdom of such a method. Writing in 1933,[9] he said that "what a judge really does is to take the language before him * * * and try to find out what the (legislators) would have done, if the case before him had been before them. * * *[10] Strictly speaking,

it is impossible to know what they would have said about it, if it had. All they have done is to write down certain words to apply generally to situations of that kind. To apply these literally may either prevent what was plainly the general meaning, or leave undisposed of what there is every reason to suppose they meant to provide for. Thus, it is not enough for the judge to use a dictionary. * * * (He) cannot suppose that what has been said * * * should leave unexecuted its own purpose." And Judge Hand, while criticizing the school which would have the judge decide entirely according to his own notions of justice, decried the school of sheer literalism which he dubbed the "dictionary school." Judge Hand, in opinions for this court, has expressed similar views. In Federal Deposit Ins. Corp. v. Tremaine, 2 Cir., 133 F.2d 827, 830, he remarked: "There is no surer guide in the interpretation of a statute than its purpose when that is sufficiently disclosed; nor any surer mark of over solicitude for the letter than to wince at carrying out that purpose because the words * * * do not formally quite match * * * it." It is, he said, in Cabell v. Markham, 2 Cir., 148 F.2d 737, 739, "one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning."[11] In Borella v. Borden Co., 2 Cir., 145 F.2d 63, 64-65, Judge Hand wrote: "We can best

5. Pound, A Hundred Years of American Law, in Law, A Century of Progress 1835–1935, Vol. I, p. 8.

6. Nicomachean Ethics, 1137b; the passage is quoted in Usatorre v. The Victoria, 2 Cir., 172 F.2d 434, note 12.

7. See, e. g., Kiss, Equity and Law, in the volume, Science of Legal Method (1917) 146.

8. Plowden's comments on Eyston v. Studd, 2 Plowden, 450, 465–467, 75 Eng.Rep. 688, 695–699.

9. Learned Hand, How Far is a Judge Free in Rendering a Decision, Law Series, I Lectures, No. 14 (National Advisory Council on Radio in Education (1933).

10. Here Judge Hand was repeating what Aristotle and Plowden had said. See Aristotle, Nicomachean Ethics, 1173b; 2 Plowden, 450, 465–467 (1574), 75 Eng. Rep., 695–696. See also N. L. R. B. v. National Maritime Union, 2 Cir., 175 F. 2d 686, 690 notes 4 and 7; Usatorre v. The Victoria, 2 Cir., 172 F.2d 434, 439–441, and notes 12–16; Commissioner v. Beck's Estate, 2 Cir., 129 F.2d 243, 245 note 4; Slifka v. Johnson, 2 Cir., 161 F.2d 467, 470.

11. In affirming, the Supreme Court, in Markham v. Cabell, 326 U.S. 404, 409, 66 S.Ct. 193, 195, 90 L.Ed. 165, said: "The policy as well as the letter of the law is a guide to decision."

reach the meaning here, as always, by recourse to the underlying purpose, and, with that as a guide, by trying to project upon the specific occasion how we think persons, actuated by such a purpose, would have dealt with it, if it had been presented to them at the time. To say that that is a hazardous process is indeed a truism, but we cannot escape it, once we abandon literal interpretation—a method far more unreliable." He has consistently recognized that "the colloquial words of a statute have not the fixed and artificial content of scientific symbols; they have a penumbra, a dim fringe, a connotation, for they express an attitude of will, into which it is our duty to penetrate and which we must enforce * * * when we can ascertain it, regardless of imprecision in its expression." [12] Under Judge Hand's leadership, this court has spurned the canon of interpretation which an English court formulated thus: "It is not enough to attain to

a degree of precision which a person reading in good faith can understand; but it is necessary to attain a degree of precision which a person reading in bad faith cannot misunderstand." [13]

It is well to remember that not only legislators, lawyers, and judges but men in every kind of activity [14] meet that problem of communication we call "interpretation." [15] The mathematicians alone seem able to solve the problem with complete satisfaction, although some mathematicians more than suggest that the satisfaction is sometimes an illusion; [16] and certainly today lawyers know that their language cannot begin to approximate that of mathematicians. Indeed, at times, lawyers may join those who rejoice in "the resources of ambiguity." [17]

However that may be, no one can deny that "legislative intention" is sometimes a good deal of a fiction; [18] then the effort

12. Commissioner v. Ickelheimer, 2 Cir., 132 F.2d 660, 662, 145 A.L.R. 556, dissenting opinion; cf. Lehigh Valley Coal Co. v. Yensavage, 2 Cir., 218 F. 547, 552–553.

13. In re Castrom (1891) 1 Q.B. 149, 167.

14. Literary criticism has much to teach lawyers—as the lawyers have much to teach literary critics—about "interpretation."

As to the problem in still other fields, cf. Popper, The Open Society (1950) 213–218, 632.

15. Of course, the lawyers' communication problem is not restricted to the area of statutes. It is found also, e. g., in connection with wills, contracts, and all other writings, and notably in reference to the finding of facts in trial courts. See Frank, Courts on Trial (1949) 186ff, 299, 309; Fuller, Basic Contract Law (1947) 666–670; Wurzel, Methods of Juridical Thinking (1904) in The Science of Legal Method (1917) 286 at 394–400; Ricketts v. Pennsylvania R. Co., 2 Cir., 153 F.2d 757, at pages 760–764, 164 A.L. R. 387, concurring opinion.

16. Hadamard, The Psychology of Invention in the Mathematical Field (1945) Chs. 6–8.

17. Burke, A Grammar of Motives (1945), Introduction and p. 56; Richards, How

to Read a Page (1942) 22; Frank, Courts On Trial (1949) 278.

18. So Gray has pointed out. Gray, Nature and Sources of Law (2d ed.) Sec. 370.

Interestingly, if a bit exaggeratedly, Radin, after quoting, "Ascertainment of the intention of Congress in this situation is impossible," went on to say: "If by this statement Justice Jackson is thinking of 'intention' in accordance with the meaning usually given it, as an idea or a group of ideas in the minds or minds of determinate human beings, I fully and enthusiastically agree with him. The use of the term, however, generally implies that bloodless and sinewless fiction of interpreters, the imaginary 'legislator,' *le legislateur, der Gesetzgeber,* the *homo legiferens,* own cousin to the 'economic man.' What this spectre thought or did not think, intended or did not intend, imagined or did not imagine, is utterly irrelevant, since *he is created for the purpose of having a particular intention of the interpreter imputed to him.* But if we have in mind not this figment, but the actual human beings, several hundred of them, who voted in favor of the Fair Labor Standards Act in the House of Representatives and the Senate, Justice Jackson is overwhelmingly right in saying that we cannot possibly determine what their intentions were, beyond the actual words they used

to interpret may become irksome, and literalism may seem an inviting exit from perplexity. But when the legislative purpose is discoverable, although ambiguously expressed (for one of a variety of reasons),[19] then, as Holmes[20] and Learned Hand have warned, priggishly to stay within the enclosure of the precise words is a mistake. Holmes counselled that a court ought not be school-marmish with legislators, as if to say to them: "This will teach you boys to be more careful the next time." The present case seems to me to be one where literal interpretation spells just such judicial uppishness.

My colleagues' decision interprets the 1938 amendment with such literalness that it has the astonishing consequence of ascribing to Congress the aim of actually enfranchising persons who, before the amendment, were not permitted to vote. For, previous to 1938, many courts had forbidden claims of even bona fide disinterested creditors to be voted by proxies who were officers or attorneys of the bankrupt.[21] But my colleagues hold that, thanks to the "plain language" of the amended statute, Schneider, an officer (President) of the bankrupt, properly voted, as a proxy, the claim of a creditor, the Meat Company.

Perhaps my colleagues had this curious consequence in mind when, to justify their literal interpretation, they cited West Hills Memorial Park v. Doneca, 9 Cir., 131 F.2d 374, which I think is not in point. There

the court held that a deceased attorney's claim for services rendered the bankrupt corporation might be voted. Obviously, as the attorney was no longer alive, there was no danger of his influencing the election in a manner favorable to the bankrupt company. That his non-existence was the controlling factor is shown by what the court said in its opinion, 131 F.2d at page 376: "While it may be true that we could add other exceptions to the statute on equitable grounds * * * we think there are no such grounds here. We suppose the reason for denying the bankrupt's attorney the right to vote for a trustee would be that he, with other creditors, might, by collusion or fraud, appoint a trustee who would favor his voters through malfeasance, misfeasance, nonfeasance, or partiality, at the expense of the other interested persons. Whatever reason might be advanced, it is clear that it could not apply here because the attorney is dead. Being dead, there would be no way in which he might take advantage of anyone. We believe, therefore, that if the claim were properly allowed, it was entitled to its vote."[22]

As a bolster to their decision, my colleagues intimate that it might possibly have been shown, at the time of the voting, that Levy, the nominee of the other creditors, was disqualified: Referring to something not in the record, my colleagues say that the trustee "now asserts" that he has begun

in the statute." Radin, A Case Study in Statutory Interpretation: Western Union Co. v. Lenroot, 33 Calif.Law Rev. (1945) 222–223. Cf. Wurzel, loc. cit. 355–356.

19. The ambiguous expression is by no means always due to carelessness: (a) Judges, some of whom like to lecture legislatures, cannot themselves possibly avoid all ambiguities in their own compositions. See Sperbeck v. A. L. Burbank & Co., 2 Cir., 190 F.2d 449, 451–452, and note 15; (b) Sometimes the legislature is deliberately ambiguous. See Jaffe, 47 Col.L.Rev. (1947) 359, 366–367; U. S. v. Associated Press, D. C., 52 F.Supp. 362, 370; Pekelis, The Case For a Jurisprudence of Welfare, 11 Soc. Research (1944) 312. Often, as Aristotle warned in a passage Plowden

and others have repeated or paraphrased, the legislature cannot foresee and describe all the particulars covered by the purpose (policy) of the statute. See citations note 10, supra.

20. Johnson v. U. S., 1 Cir., 163 F. 30, 32, 18 L.R.A.,N.S., 1194; International Stevedoring Co. v. Haverty, 272 U.S. 50, 52, 47 S.Ct. 19, 71 L.Ed. 157.

21. In re Sitting, D.C.S.D.N.Y., 182 F. 917; In re Rekersdres, D.C.S.D.N.Y., 108 F. 206; 3 Collier on Bankruptcy (14 ed. 1941) § 56.03.

22. Apropos of the court's reference to adding "exceptions to the statute on equitable grounds," see the citations re the "equity of a statute," in Slifka v. Johnson, 2 Cir., 161 F.2d 467, 470 notes 5 and 6.

suit to recover an alleged preferential payment, not from any creditors whose claims were voted for Levy, but from the persons who served as proxies in voting those unchallenged claims. But, all else aside, since there was no trustee at the time of the voting, it follows that, if the beginning of such suit be a fact, it is not a fact which could have been before the Referee at the time of the election or is before us now as a part of the record. We ought therefore to ignore it. At most, it is an unsupported, unsworn, self-serving declaration by the trustee which proves nothing about the basis for the suit or the fact of any alleged preference. If the trustee brought such a suit, he may have done so only with the idea that he could tell us about it, as evidence that his rival was disqualified. The trustee also quotes in his brief an equally partisan statement made (not under oath) to the Referee by the trustee's own lawyer that there may have been a $1,000 preferential payment to the proxies.[23] A mere unsworn assertion from so biased a source could not, of course, disqualify the proxies or their nominee any more than the trustee's own outside-the-record assertion that he is presently engaged in suing proxies of his opponent's supporters. We have, then, no evidence before us on which to decide whether or not those proxies had been illegally preferred by the bankrupt. Moreover, there was no evidence that these proxies had actively solicited their own appointment in an attempt to run the election in their own interests, as the assignee's attorneys had done in Re Stowe, D.C.N.D. Cal., 235 F. 463. But if the Referee had suspected that this was the case, he would, I think, have been obliged to examine the proxies on the subject, and, at least, to

postpone the meeting so as to afford the owners of the claims a chance themselves to vote or to appoint new proxies, in order to prevent disenfranchisement.

2. Even if the Meat Company's claim did not suffer from the affiliation-defect, it should not have been allowed to vote. For Section 57, sub. a, of the Bankruptcy Act—11 U.S.C.A. § 93—states that a "proof of claim shall consist of a statement under oath, in writing and signed by a creditor, setting forth the claim; the consideration therefore; * * *" To set forth a claim properly, the creditor must tell enough details about the circumstances and terms of the transaction to (1) enable other creditors to dig out and expose fraud or illegality in the claim and (2) allow the referee to pass on the claim intelligently. Although a claim approved for voting can later be challenged and disallowed, the courts have recognized the importance of screening out fraudulent claims at an early stage, for, since a fair and impartial trustee is an essential of a successful bankruptcy proceeding, fraudulent claims should not contribute to a trustee's election. Furthermore, a valid proof of claim shifts the burden of going forward with evidence of fraud, at any later stage, to objecting creditors; and the formal proof has itself probative force as evidence of the claim's validity if later challenged. Whitney v. Dresser, 200 U.S. 532, 26 S.Ct. 316, 50 L. Ed. 584; In re Louis Elting, Inc., D.C.S.D. N.Y., 4 F.Supp. 732; In re Falk, D.C.S.D. N.Y., 83 F.Supp. 817. For these reasons, the courts require a creditor to show *prima facie* that he has a good claim before they allow him to vote for a trustee.

It is true that, at this stage, the creditor may state the basis of his claim by oath or

---

23. "Mr. Welling: Your Honor, on behalf of the receiver, I think I ought to say this: I notice that the proxies run to Feder and Cohen. The examination of Jacobs, an officer of the bankrupt, disclosed that after the business closed down and while the business was hopelessly insolvent, $1000 was paid by this man Jacobs on behalf of the bankrupt out of the bankrupt's funds to Messrs. Feder and Cohen which, according to this testimony, was deposited in a special account. The bankrupt's, that is, Jacobs' testimony, further recited that he didn't definitely know what that money was in payment for. The trustee will, of course, have to investigate the circumstances surrounding this payment and take any action that may be necessary to recover, and I think that it is the receiver's duty to report that so as to assure an election of a trustee whose independence—"

affidavit; he is entitled to be believed if this testimony is not self-contradictory. If another creditor doubts his word, that creditor must disprove it. If he suspects an illegal preference from the facts in the claim, he must show that, too. In re Bronx Ice Cream Co., 2 Cir., 66 F.2d 620, 624. Precisely for this reason—so that creditors can get clues to fraudulent claims—the claimant must tell all about the transaction giving rise to the debt. If he fails to do so, his claim has no *prima facie* validity, and cannot be allowed, whether or not any other creditors introduce evidence to show its fraudulent nature. In re Pringle Engineering & Mfg. Co., 7 Cir., 164 F.2d 299, 302.

Thus, claims no more vague and non-informative than this one have been struck down. Debts charged for "expenses of the bankrupt", In re Pringle Engineering & Mfg. Co., supra; "services rendered", Hutson v. Coffman, 9 Cir., 100 F.2d 640; "printing done for * * * bankrupt at its request", In re Blue Ridge Packing Co., D.C.N.D.Pa., 125 F. 619, 621; "deficiency on chattel mortgage, on * * * goods, wares and merchandise sold * * * to the * * * bankrupt", In re Federal Silk Hosiery Works, 2 Cir., 68 F.2d 899, 900; "goods sold and delivered", In re Louis Elting, D.C.S.D.N.D., 4 F.Supp. 732, 733—all these have been held bad. The creditor must tell when the transactions occurred, which specific goods or services passed, at what prices or charges—in short, everything a normally acute businessman wants to know about any bill before he acknowledges it.

The same rule applies to claims for "money loaned and borrowed by the bankrupt." The dates of the loans should be itemized; the amounts loaned in each instance; the purposes for which the money was lent; the terms and maturity dates of repayment; the rate of interest charged. See, e. g., In re Falk, supra; In re Lansaw, D.C.Mo., 118 F. 365; In re Wooten, D.C. S.D.N.C., 118 F. 670; In re Castle Braid Co., D.C.S.D.N.Y., 145 F. 224; In re Century Silk Mills, D.C.N.Y., 296 F. 713; In re Coventry Evans Furniture Co., D.C.N. D.N.Y., 166 F. 516. Check stubs, memos, or notes evidencing the loan should be attached. See In re Greenfield, D.C.Pa., 193 F. 98. All this information is essential to a determination of the claim's validity. How else can a referee tell if the claim is on its face barred by the statute of limitations? See In re Ballantine, D.C. N.D.N.Y., 232 F. 271. How can he tell if the money has been loaned at a usurious rate of interest? In re Falk, supra.

It has been suggested that, because of the provision for a creditors' meeting at which the bankrupt is publicly examined, there is no longer any need for informative claims. That suggestion lacks cogency. Creditors without clues should not have to question the bankrupt about every possible type of fraud that might be involved in every claim presented for payment. Such indiscriminate questioning would soon become perfunctory or be omitted altogether. Creditors should be able to concentrate their inquiries on those claims that elicit suspicion on their face.

The New York Meat Company's claim rates a flat zero on all the tests of a valid claim, according to the cases. It did not show when the loans were made, in what amounts, when they matured, what interest, if any, they bore, for what purposes they were made. The President of the Meat Company—also, as we saw, the President of the bankrupt—testified in an inconsistent and most inconclusive way about the claim. After signing an affidavit under oath that the bankrupt owed the Meat Company about $93,000 in loans, Schneider said on the stand that "as far as [he] knew, there was some twenty odd thousand dollars" owed. Later, he testified, purely from hearsay statements by an accountant, that part of the claim—he didn't know what part—was for meats sold. No schedule itemizing those sales was annexed to the claim. He said he did not know whether the Meat Company owed anything to the bankrupt. The net effect of Schneider's testimony was to cast doubt upon the truth of even the scanty informa-

tion contained in the claim.[24] Certainly, it did nothing to supplement this information or to cure the defects of the original claim, as the testimony did in West Hills Memorial Park v. Doneca, 9 Cir., 131 F.2d 374, cited by my colleagues. No check stubs, memos, or notes were submitted; no employees or disinterested witnesses testified that the loans were made at all. No accountant was put on the stand to testify about his findings in the company's books. The claim had the flimsiest support imaginable. More important, no Referee could pass on its validity reasonably; no creditor would know where to begin to investigate its validity. The petitioning creditors here, contrary to my colleagues' assertion, objected to the claim on the ground that there was no competent evidence that any debt existed at all.[25] They were certainly, as I have pointed out, under no obligation to bring forward evidence to disprove a claim that failed in every particular to meet the statutory tests of even *prima facie* validity.

So, since Meat Company's claim was on its face insufficient for voting purposes, I think that the candidate elected by a majority in number and amount of the other creditors, i. e., Levy, should have been appointed trustee, and Mills, the trustee named by the Referee, has no valid claim to the office.

24. "Q. Do you know specifically what loans were made, when and where, by the New York Meat to Grade A Foods? A. To May, 1950, I know of about twenty odd thousand dollars.

"Q. Do you know of any loan from May, 1950 to the date of the petition for involuntary proceeding in this matter? A. No.

"Q. You have no knowledge of your own whatsoever of any loans made between May, 1950 to date, is that right. A. Right.

"Q. You don't know of your own knowledge whether any part of that ninety-three thousand which you stated there is for meats or for moneys loaned, do you? A. Will you please repeat the question? No. * * *

"Q. What did you find out about the loans that had been made? A. During what period of time?

"Q. Up to the present time. A. Well, as far as I know, there was some twenty odd thousand dollars.

"Q. No, after that what did you find out? A. From this statement of the accountant, said $93,000 is the amount of money that was owed Grade A Foods to the New York Meat, approximately 99 per cent was cash and the balance fresh meat. * * *

"Q. Did you sign an affidavit there that it was moneys loaned and borrowed amounting to ninety-three some odd thousand dollars? A. Yes, according to the accountant's report.

"Q. But you didn't know of your own knowledge? A. I haven't checked.

"Q. You haven't checked as to whether any money was due from New York to Grade A? A. I didn't check that.

"Q. You haven't any checks that this money was loaned from New York to Grade A? A. No checks were shown to me, sir.

"Q. Didn't you testify on your direct examination that of your own knowledge you knew there was $20,000 loaned while you were there? A. Yes.

"Q. And you know that of your own knowledge? A. Yes." (Emphasis added.)

25. "Mr. Feder: I object to this claim further on the ground there is no evidence of any moneys loaned or borrowed from the alleged bankrupt, New York Meat Packing Co., Inc. * * * If Your Honor please, I renew the objection that there is nothing to indicate how the amount of $92,029.38 is arrived at. There is no schedule attached whatsoever to show the nature of this claim in any way.

"The Referee: Well, a proof of claim doesn't have to go into detail.

"Mr. Feder: He has to have some proof to indicate that there is such a loan.

"The Referee: Well, the affidavit of the claimant mentions money loaned or borrowed.

"Mr. Feder: There should be some checks or something in some manner to indicate that loan."