901 So.2d 905 (2005)
Marc S. WOOLF, Appellant,
v.
Cynthia R. WOOLF, Appellee.
No. 4D04-3403.
District Court of Appeal of Florida, Fourth District.
April 20, 2005.
*907 Marc S. Woolf, Wellington, Pro Se.
Helene Hvizd Morris, West Palm Beach, and Colleen Nelson, Tequesta, for appellee.

ON MOTION FOR REHEARING AND MOTION FOR REHEARING EN BANC
TAYLOR, J.
We deny Cynthia R. Woolf's motion for rehearing and motion for rehearing en banc. However, we withdraw our previous opinion and substitute this opinion in its place.
Marc Woolf appeals a final order which found him in contempt, denied his petition for modification of alimony and child support, and charged him with a portion of his former wife's attorney's fees. We conclude that the trial court entered the contempt order without sufficient notice to appellant, and that the court abused its discretion in denying the modification motions and awarding attorney's fees in light of the parties' current financial situations.
Marc Woolf ("the former husband)" is 43 years old. He earned his law degree in 1986 and subsequently earned his masters of law in taxation. The former husband initially worked for various respected West Palm Beach firms, doing primarily tax-related work. In 1993, he went into partnership with Mark Mirkin. The firm's primary focus was corporate and securities law. The former husband owned a 45% share of the firm. Mirkin was the firm's primary rainmaker and 55% partner.
The former husband stopped doing tax work in the mid-1990's. The corporate work that he and Mirkin did involved startup companies-trying to get them funding through venture capitalists or other sources. They had a great deal of business coming in with the large number of firms going public.
Cynthia Wolf ("the former wife") has a B.S. in accounting from the University of Florida. She is a part-time accountant/bookkeeper and has not worked full-time in fourteen years. The parties' two children are thirteen and ten years old.
The parties divorced on April 25, 2000. They split their property equally, with the former wife taking the interest in the marital home and the former husband taking the interest in Mirkin & Wolf, P.A. The former wife's CAP account (a combination brokerage and checking account) on February 29, 2000, was $659,745 (out of which she paid $175,000 in taxes).
The marital settlement agreement which was incorporated in the final judgment of dissolution granted the former wife primary residential custody of the children. The former husband agreed to pay child support of $1,650 per month and permanent periodic alimony of $1,300 per month. He also was obligated to pay for the children's health insurance, the former wife's life insurance and 69% of certain other of the children's expenses. The agreement expressly provided that it would remain modifiable.
The year 2000 (the year of the divorce) was Mirkin & Woolf's best year financially. Its gross receipts for that year totaled $379,323, with total compensation to the former husband of $173,297. Approximately $90,000 of that total came from stock appreciation in a company called Cyber Care, leaving about $83,000 in income from the remainder of his law practice. At this time he was theoretically supposed to be paid an annual salary of $120,000 by his firm and a bonus of $20,000, provided there was cash to fund such payouts.
The stock market started rapidly declining in March 2000. As the economy turned down, the law firm's revenues started to decline steadily. All of the "dot. coms" were "dying." The former husband *908 testified that they always thought the economy would come out of it. But as the dot.coms died and the money dried up, so did the former husband's practice. They had enjoyed nine and a half successful years, so they were not readily willing to abandon the practice. The former husband admitted that he was in denial from having seen some robust years, thinking it had to come back, that it was just a temporary adjustment, but it never happened.
The former husband's CAP account contained $462,637.26 on January 31, 2001. His adjusted gross income for 2001 was $67,000. His CAP account on January 31, 2002 had fallen to $132,917.53. In 2002, the former husband's adjusted gross income was $32,523. By January 31, 2003, his CAP account had fallen to $52,531.97.
In the fall of 2002, the former husband's partner suddenly announced that he was planning to move to North Carolina within a week. He took many of the firm's clients and left. The former husband generated some more work and started on a job search. He contacted headhunters, followed up with interviews, and consulted with an employment specialist. He wanted to stay in South Florida because of his children, but had to interview in areas outside Palm Beach County.
On June 27, 2003, the former husband, who was still current with his obligations, moved to modify his alimony and child support. He specifically requested that alimony be reduced to $300 per month until February 1, 2007, at which point it would terminate. He also requested that child support be reduced to $1350 per month, with the parties sharing equally in the cost of health insurance and uncovered medical expenses.
In his August 21, 2003 financial affidavit, the former husband listed his previous year's gross income as $45,000. He claimed total assets of $119,964, total debts of $41,467, and a net worth of $78,497. He listed as a contingent liability a $43,000 personal guaranty on a loan to his firm, on which the bank has sued and as to which he claims there is no defense.
Meanwhile, the former husband's business and assets were continuing to decline. In 2003 his adjusted gross income was just $18,000. Most of this was earned working on his own out of his apartment without staff, as he had been evicted from his offices for non-payment of rent in April 2003. The former husband defaulted on his alimony obligation (but not his child support) beginning in November 2003. By January 31, 2004 his CAP account was down to $26,888.21.
Finally, on January 4, 2004, the former husband found employment in the family law area with a firm in West Palm Beach. His base salary with that firm was $48,000. Unfortunately, this relationship lasted only about two months. The firm laid off the former husband because it decided that it did not want to wait while he developed more business.
The former husband testified that he could "hang out a shingle," but because the corporate securities area is still weak, he would not have many clients. He testified that he is willing to expand into anything. His plan is to "hit the pavement" and try and get a job. He hopes to someday make $100,000 to $160,000, but he stated that it does not seem a likely possibility at the present time.
By contrast to the former husband's declining fortunes, the former wife's CAP account grew from $225,641.82 on December 31, 2002 to $232,750.80 on December 31, 2003, despite having paid attorney's fees in connection with this matter of $7,575 during that period. Her second amended financial affidavit lists her annual income as $6,506.25, but her total assets *909 are $511,148 and her net worth is $315,213.[1]
The former wife testified that once her kids go to college she hopes to work full-time again. Currently, she works an average of nine hours per week. She testified that the only luxury she has is the ability to take care of all of her children's needs, including their transportation to school and lessons. She does not think she could make over $20,000 per year working full-time. When asked about her new Lexus 330 lease, she responded that she never claimed that she was in "dire straits."
The primary focus of the final hearing was the testimony of Val Nardo, the former wife's vocational expert. Nardo issued a vocational assessment declaring that there was a $100,000 to $160,000 wage range for someone with the former husband's skills and experience and that the former husband had voluntarily reduced his income.
Nardo testified that the former husband's skills in the tax field could easily be upgraded. He testified that in 2002 the average partner was earning $293,000 and the average associate was earning $109,000. He said that he had talked to one person who said that the former husband might have some difficulty working in the tax field, but that if he worked towards that goal he could gain employment. He admitted that it is not as easy as five years ago, but he felt that the economy is getting better and there are people with the former husband's skills earning money.
In Nardo's opinion, the former husband should not be making $18,000 a year, or even $48,000 a year. He testified that if the former husband had started early on in redeveloping his skills in the tax area, or started looking for other opportunities in the corporate and securities area, he would not facing his current dilemma.
Nardo characterized the former husband's job search as very weak, as he could point to only about eight or nine job contacts during 2003. In his opinion, since the market turned down in 2001, all of the activity should have been done before that to readjust the situation. According to Nardo, someone looking for work should expend at least twenty-five hours per week in employment search and there is no indication that has been done in this case.
Nardo testified that in a half hour he was able to locate several law firms in Palm Beach, Broward, and Dade involved in securities and tax. He felt that the former husband should have contacted each firm personally. However, Nardo did not say that any of these firms had openings.
Nardo testified that he found a tax job open in Miami with a starting salary of $100,000 to $300,000, but the employers wanted some type of "portfolio." On the former husband's cross-examination, Nardo agreed with the former husband's headhunter that the corporate market remains soft and firms are being very particular in wanting $350,000 to $400,000 in "portables." Nardo went on to concede that the former husband's lack of portables would impair his ability to get a job and that the former husband might want to look at another area of expertise. Nardo could not answer whether tax attorneys would also need portables.
Nardo conceded that it was not unreasonable for the former husband to have attempted the stint with the family law firm, but he predicted that the former *910 husband would have faster success in the tax area than in family law.
On January 9, 2004, more than two months in advance of the scheduled final hearing before the commissioner appointed to hear this case, the trial court entered an order which stated that "[i]f the Former Wife files a motion for contempt it shall be set on the March 2004 docket and heard at the time of trial." The parties' joint pretrial statement did not list contempt as an issue to be tried.
The former wife's motion for civil contempt was not filed or served until March 17, 2004. The former husband did not receive it until two days before the March 19, 2004 hearing. He objected to having the motion for contempt heard on such short notice. Initially, the commissioner stated that the motion had not been filed in time to be heard at this hearing. Without ruling on the objection, however, the commissioner ultimately recommended a contempt finding, which, in turn, was adopted by the trial court's final order. The contempt is for five months of alimony arrearage, totaling $6,500.
At the final hearing, the former wife's attorney presented an invoice for 70.80 hours of work at $300 per hour, plus costs of $1,993.21, for total fees and costs to date of $23,688.21.
During her testimony, the former wife's attorney claimed that numerous court appearances and motions were required because of the former husband's failure to comply with discovery requests in a timely fashion and the need to file a contempt motion for the alimony delinquency. Aside from the undisputed alimony arrearage, the record does not support the attorney's claim. It was actually the former husband who moved to compel discovery and for sanctions, which resulted in an order requiring both sides to exchange discovery documents by a date certain. The former wife did move to compel discovery two days prior to the hearing, but it was apparently not heard.
In her report on the modification hearing, the commissioner stated:
The Former Husband had a practice in securities law which failed due to a downturn in the economy, but there is nothing to preclude him from either finding employment as a tax attorney or having his own law practice in an area in which he is competent. The Former Husband has not, according to the Former Wife's expert, made an effective job search, and he is capable of earning $100,000.00 to $160,000.00 annually. This is in the range of his earnings at the time of the divorce, since he testified that the year he earned $173,000.00, $90,000.00 of it was from legal work and the balance was from a sale of stock. There is insufficient evidence of a substantial change in circumstances to entitle the Former Husband to a modification of the Final Judgment. It appears the Former Husband has not made a good faith effort to maintain a law practice, has voluntarily spent down his assets and is deliberately under-employed. The Former Wife has not worked full time since the parties' children were born and she is not under-employed.
In addition to granting the motion for contempt, the order required the former husband to pay $10,000 towards the former wife's attorney's fees.
The trial court accepted the commissioner's findings, ruling that the former husband has not made a good faith effort to maintain a law practice, has voluntarily spent down his assets, and has deliberately been underemployed. He found the former husband in contempt and ordered him to pay the $10,000 in attorney's fees.

Contempt
Florida Family Law Rule 12.615 (2004) requires the following for notices of *911 hearing of civil contempt in support matters:
The notice must specify the time and place of the hearing and must contain the following language: "FAILURE TO APPEAR AT THE HEARING MAY RESULT IN THE COURT ISSUING A WRIT OF BODILY ATTACHMENT FOR YOUR ARREST. IF YOU ARE ARRESTED, YOU MAY BE HELD IN JAIL UP TO 48 HOURS BEFORE A HEARING IS HELD."
The above warning serves as a predicate for the issuance of a writ of bodily attachment should the alleged contemnor not appear. See Martyak v. Martyak, 881 So.2d 48, 49-50 (Fla. 4th DCA 2004). This language was not contained in the "notice of hearing" in this case (i.e., the order which stated that contempt would be heard at the March hearing if the motion was filed).
The former husband contends that the hearing officer erred in going forward with the contempt motion without proper notice. The former wife argues that since the former husband appeared at the hearing, the language contained in the notice is irrelevant and that any defect was waived. The former wife cites analogous situations where the court has found technical notice requirements unenforceable due to waiver or similar grounds. See Patry v. Capps, 633 So.2d 9, 12 (Fla.1994) (holding that where the defendant acknowledges timely receipt of notice, strict compliance with certified mail provision is not required); Schumacher v. Town of Jupiter, 643 So.2d 8 (Fla. 4th DCA 1994) (stating that a landowner may waive or be estopped to assert the right to notice where he appears at the hearing and is able to fully and adequately present any objections to an ordinance); Anderson v. State, 637 So.2d 971 (Fla. 5th DCA 1994) (stating that if the defendant had actual notice of state's intent to seek habitualization, strict statutory compliance in notice form is unnecessary). These authorities are persuasive by analogy and we consider the notice language waived by the defendant's actual appearance at the hearing.
The more fundamental problem with the notice, however, was not waived. Here, the former husband was not provided with the contempt motion, which "activated" the contingent "notice of hearing," until two days before the hearing.
While a person facing civil contempt is not entitled to all of the due process rights afforded to a person facing indirect criminal contempt, he or she is nonetheless entitled to a proceeding that meets the fundamental fairness requirements of the due process clause of the Fourteenth Amendment. Bresch v. Henderson, 761 So.2d 449, 451 (Fla. 2d DCA 2000). This requires that the alleged contemnor be provided with adequate notice and an opportunity to be heard. Id. Two days notice is insufficient notice of a contempt hearing. Goral v. State, 553 So.2d 1282, 1283 (Fla. 3d DCA 1989); Harreld v. Harreld, 682 So.2d 635 (Fla. 2d DCA 1996); see also J.B. v. Fla. Dep't. of Children and Family Servs., 768 So.2d 1060, 1066 (Fla.2000) (noting that two days notice has been held insufficient when far less important interests than parental termination is at stake) (citing Montgomery v. Cribb, 484 So.2d 73, 75 (Fla. 2d DCA 1986) (holding that two days notice is insufficient for motion to strike)).The contempt order must therefore be reversed and remanded for a new hearing upon adequate notice.

Modification of Alimony and Child Support
The abuse of discretion standard of review applies to trial court orders in modification of alimony and child support cases. See Buttermore v. Meyer, 559 So.2d 357, 359 (Fla. 1st DCA 1990). A *912 trial court's findings regarding imputation of income must be supported by substantial competent evidence. Tarnawski v. Tarnawski, 851 So.2d 239, 242 (Fla. 4th DCA 2003).
Permanent periodic alimony is used to provide the needs and necessities of life to a former spouse as they have been established by the marriage of the parties. Canakaris v. Canakaris, 382 So.2d 1197, 1201 (Fla.1980). Florida Statute § 61.14 (2004), governs the modification of alimony. It provides that when the "circumstances or the financial ability of either party changes" either party may apply for modification. § 61.14(1)(a) Fla. Stat. (2004). The court has jurisdiction to make orders "as equity requires, with due regard to the changed circumstances or the financial ability of the parties...". Id.
Similarly, Florida Statute § 61.13(1)(a)(2004) confers jurisdiction on the trial court to modify child support "when there is a substantial change in the circumstances of the parties."
There are three fundamental prerequisites to modification of alimony. First, there must be a substantial change in circumstances. Second, the change was not contemplated at the time of final judgment of dissolution. Third, the change is "sufficient, material, involuntary, and permanent in nature." Pimm v. Pimm, 601 So.2d 534, 536 (Fla.1992); Damiano v. Damiano, 855 So.2d 708, 710 (Fla. 4th DCA 2003). Where the alimony is set by the parties' agreement, the party who seeks a change carries a heavier burden. Pimm, 601 So.2d at 537.
The "permanency" of the former husband's financial situation is not discussed by the parties or the court below. Since the condition had lasted over a year at the time of the final hearing, with no apparent end in sight, it should be deemed sufficiently permanent. See Haas v. Haas, 552 So.2d 252 (Fla. 4th DCA 1989) (finding that a physician's loss of staff privileges and surgical practice due to alcoholism was sufficiently permanent despite fact that he had since regained his board certification).
The primary issue in this case is whether or not the change in the former husband's financial circumstances was involuntary. This inquiry is the flip-side of the voluntary limitation of income inquiry for imputing income. See Garone v. Goller, 878 So.2d 430, 431 (Fla. 3d DCA 2004) (holding that income must be imputed where unemployment or underemployment is found to be voluntary).
In Tarnawski v. Tarnawski, 851 So.2d 239, 242 (Fla. 4th DCA 2003), we reversed the imputing of income to the wife where there was no evidence of the prevailing wages in the community for the household work she performed or of the availability of positions. We concluded that the imputing of income was based "not on substantial competent evidence but on conjecture." We also found error in the lower court's finding that the former wife was voluntarily underemployed without showing the "availability of positions" for which she was qualified. The evidence in this case showed that while there were openings for attorneys with the former husband's skills, the firms all wanted attorneys with a substantial client base. The former husband had lost his due to the bursting of the technology stock bubble and the loss of his rainmaking partner and many of the firm's clients. This critical failure of proof requires reversal of the modification denial which was predicated on the former husband's deliberate underemployment. See also Zubkin v. Zubkin, 823 So.2d 870 (Fla. 5th DCA 2002) (reversing modification decree which imputed excessive income).
This court's decision in Florida Dept. of Revenue ex. rel. Kaiser v. Kaiser, 890 So.2d 364 (Fla. 4th DCA 2004), is distinguishable. *913 The former husband in that case attempted to move a thriving telecommunications business, causing it to fail, refused to return to Palm Beach County where he had previously succeeded, then began working as a $6.00 per hour grass cutter without continuing to look for employment commensurate with his demonstrated skills.
As the court stated in Hinton v. Smith, 725 So.2d 1154, 1157 (Fla. 2d DCA 1998), "the attainment of a degree alone does not guarantee employment or a particular salary and, thus, does not constitute sufficient evidence to support imputation." The court there continued:
Neither does expert testimony establishing the prevailing earnings level for holders of a particular degree constitute evidence sufficient to impute that amount of income to a former spouse for child support purposes.... As a general rule, where we have upheld the trial court's imputation of income, the spouse had a track record of having earned the imputed amount.
In Stewart v. Rich, 664 So.2d 1145 (Fla. 4th DCA 1995), we reversed an imputation of income to a wife who had earned a law degree, stating:
Possession of a law degree does not ensure self-sufficiency... nor does a law degree automatically translate into a job, a fact well-known by many recent law graduates.... Theoretically, the former wife had acquired an earning capacity; in reality, however she has absolutely no history of earnings and no track record.
Although the former husband in this case has a track record of earnings, it has been a poor one in recent years through no apparent fault of his own.
Laliberte v. Laliberte, 698 So.2d 1291, 1293 (Fla. 5th DCA 1997), is factually similar to this case. There, the former husband was forced to quit his practice in Florida due to business necessity. When he purchased a business in Pennsylvania to maintain his income, it turned out to have grossly overstated assets. The fifth district reversed the trial court's refusal to modify, stating:
As the trial court found, the former husband was beset by bad luck. However, the former husband should not be punished because of economic downturns which were not deliberate on his part and which were not done to avoid paying alimony and child support.... In the instant case, the overwhelming evidence is that the former husband has suffered a substantial change in circumstances that is involuntary.
Laliberte, 698 So.2d at 1293.
In Thomas v. Thomas, 589 So.2d 944, 947 (Fla. 1st DCA 1991), the court discussed the "clean hands doctrine" as preventing a court from relieving a party of its support obligation where the decrease in financial ability is brought about voluntarily, "for example, permitting a thriving business to be closed down and making no effort to find other employment...". The evidence in this case shows that the former husband's business was anything but thriving and that he did try to find other employment, making multiple job contacts, working with a headhunter and an employment consultant and, in fact, securing alternative employment as a lawyer for what turned out to be a relatively short period. This is perhaps the best evidence of the good faith nature of his job search. See Parker Lumber Co. v. Hart, 497 So.2d 948 (Fla. 1st DCA 1986) (citing Stahl v. Southeastern X-Ray, 447 So.2d 399 (Fla. 1st DCA 1984) (concluding that obtaining and performing a full-time job constitutes an adequate job search for purposes of workers' compensation "work search" rule)). We note that this latter employment was at less than half the income imputed to him, yet even at that compensation level *914 he could not produce sufficient business to survive.
We recognize that a strong showing is required before a modification is granted upon a change of economic conditions, especially where the party seeking reduction is operating in an entrepreneurial capacity. Thomas, 589 So.2d at 947. This is because an entrepreneur can easily record a drastic fluctuation in income by the degree of initiative employed in securing and accepting remunerative work or business. Id; O'Brien v. O'Brien, 407 So.2d 374, 375 (Fla. 1st DCA 1981). However, in this case the nature of the former husband's work, the fate of the dot.com bubble, and the sudden loss of his partner and client base were all undisputed. Based on these circumstances, we conclude that the former husband has met this high burden.
We further conclude that the former husband would be entitled to retroactive relief to the date of his petition. See DeSantis v. Smith, 634 So.2d 796, 797 (Fla. 4th DCA 1994). On remand, the trial court shall use the former husband's $45,000 gross income figure as reflected in his financial affidavit in determining the amount of his modified child support and alimony obligation (unless there has been some substantial change in the husband's financial condition since the final hearing). Of course, the modification is limited by the size of the modification requested below.
We uphold the trial court's refusal to impute income to the former wife for essentially the same reason that it was inappropriate as to the former husbandthat there was no showing of available positions for the former wife.

Attorney's Fees
An award of attorney's fees will not be reversed absent an abuse of discretion. Ondrejack v. Ondrejack, 839 So.2d 867, 872 (Fla. 4th DCA 2003).
Fla. Stat. § 61.16(1)(2004) provides:
The court may from time to time, after considering the financial resources of both parties, order a party to pay a reasonable amount for attorney's fees, suit money, and the cost to the other party of maintaining or defending any proceeding under this chapter, including enforcement and modification proceedings and appeals.
The purpose of this statute is to ensure that both parties will have a similar ability to obtain legal counsel. Rosen v. Rosen, 696 So.2d 697, 699 (Fla.1997).
The financial resources of the parties are the primary factor to be considered. Id. at 700. Where the parties are in financial parity, yet the trial court has awarded fees to one spouse, we have not hesitated to reverse. See Wait v. Wait, 886 So.2d 318 (Fla. 4th DCA 2004); Hackney v. Hackney, 560 So.2d 423 (Fla. 4th DCA 1990). The parties in this case are in financial parity, making the partial award to the former wife erroneous and reversible.
We recognize that there are cases where, despite equalized assets, one spouse's vastly superior income makes an award to the other spouse appropriate. See Margulies v. Margulies, 645 So.2d 54, 54 (Fla. 4th DCA 1994). However, in this case the former wife's assets substantially exceed the former husband's, pulling them into parity despite his greater income. See Smith v. Smith, 737 So.2d 641, 643 (Fla. 1st DCA 1999) (holding that the trial court may impute income to voluntarily unemployed or underemployed spouse for attorney's fee purposes).
In addition to the primary factor of the relative financial resources of the parties, other relevant circumstances considered by a court of equity include: 1) the *915 scope and history of the litigation; 2) the duration of the litigation; 3) the merits of the respective positions; 4) whether the litigation is brought or maintained primarily to harass (or whether a defense is raised mainly to frustrate or stall); and 5) the existence and course of prior or pending litigation. Rosen, 696 So.2d at 700.
Several cases have recognized the appropriateness of attorney's fee awards in dissolution cases based on the litigation misconduct of the parties. See Binker v. Binker, 781 So.2d 505 (Fla. 3d DCA 2001); Simpson v. Simpson, 780 So.2d 985, 988 (Fla. 5th DCA 2001); McAliley v. McAliley, 704 So.2d 611, 613 (Fla. 4th DCA 1997); Mettler v. Mettler, 569 So.2d 496, 498 (Fla. 4th DCA 1990). Both sides point the finger at each other, but aside from some vague testimony of the former wife's attorney, the record does not support the notion that either side has engaged in any serious misconduct here. Certainly, the commissioner did not feel that there had been any serious misconduct as her comments at the hearing and the absence of any such finding would indicate. See also Crowley v. Crowley, 678 So.2d 435, 440 (Fla. 4th DCA 1996) (discussing that merely aggressive, persistent or acrimonious behavior is not an abuse of system sufficient to support attorney's fee award).
In sum, we reverse the contempt order and remand for further hearing upon proper notice. We reverse the denial of modification of alimony and child support and remand for further proceedings consistent with this opinion. We also reverse the award of attorney's fees.
Reversed and Remanded.
FARMER, C.J., and SHAHOOD, J., concur.
NOTES
[1] The former husband also points out that this net worth figure is understated by approximately $35,000, as the wife counted her new Lexus 330 lease as a liability but did not count the vehicle itself as an asset.