2 So.3d 305 (2008)
John P. LINSTROTH, Appellant,
v.
Carol A. DORGAN, Appellee.
Nos. 4D07-1493, 4D07-3469.
District Court of Appeal of Florida, Fourth District.
June 11, 2008.
Rehearing Denied September 3, 2008.
*306 Joseph D. Farish, Jr., of Law Office of Joseph D. Farish, Jr., LLC, West Palm Beach, for appellant.
Adam S. Gumson of Jupiter Law Center, Jupiter, for appellee.
DAVIDSON, LISA, Associate Judge.
These former spouses divorced in 1992. At that time, the trial court judge awarded the former wife $2,775 per month as permanent periodic alimony. In 2002, the former wife began cohabiting with James Stewart. One year later, the parties consented to an agreed order reducing alimony to $1,550 per month. Two years after that, the former husband brought this proceeding to reduce or terminate his alimony obligation, citing the recent enactment of section 61.14(1)(b), Florida Statutes (2005). The former wife countered with a request to return the amount of alimony to its original level of $2,775 per month. The trial court judge entered a final order denying termination and any reduction of alimony and granting the former wife's request.
In 2005, the Florida Legislature enacted section 61.14(1)(b) which permits a court to reduce or terminate an award of alimony "upon specific written findings by the court that since the granting of a divorce and the award of alimony a supportive relationship has existed between the obligee and a person with whom the obligee resides." "Supportive relationship" is not defined in the statute but the purpose of the statute is summarized as follows:
This paragraph does not abrogate the requirement that every marriage in this state be solemnized under a license, does not recognize a common law marriage as valid, and does not recognize a de facto marriage. This paragraph recognizes only that relationships do exist that provide economic support equivalent to a marriage and that alimony terminable on remarriage may be reduced or terminated upon the establishment of equivalent equitable circumstances as described in this paragraph.
§ 61.14(1)(b)3., Fla. Stat. (2005). The standard of review in determining what constitutes a "supportive relationship" as contemplated by section 61.14 is de novo since it requires the court to interpret the applicable law. See Chrestensen v. Eurogest, Inc., 906 So.2d 343, 344 (Fla. 4th DCA 2005); Buxton v. Buxton, 963 So.2d 950, 953 (Fla. 2d DCA 2007). We review the trial court's factual findings to determine whether they are supported by competent, substantial evidence. Buxton, 963 So.2d at 953.
In Buxton, the Second District Court of Appeal discussed the new provision of section 61.14(1)(b) and determined that financial support is but one factor to be considered in concluding whether a "supportive relationship" exists. While consideration of financial support is an important part of that analysis (determining which relationships are equitably analogous to marriage) that factor alone does not define whether a "supportive relationship" exists. Id. at 955.
The former wife in Buxton lived with her paramour for ten years in a house owned by the former wife. 963 So.2d at 955. The paramour paid her rent of $575 per month which was not listed as "rent" on the former wife's tax returns. Id. at 952. The couple slept in the same bed and shared household chores, maintenance, and items. Id. at 955. The couple, however, did not have joint bank accounts. Id. The *307 appellate court concluded that the factors presented in Buxton established that the couple was in a long-term relationship that provided both economic and social support equivalent to that of a marriage. Id. The court therefore determined that a "supportive relationship" as contemplated by section 61.14(1)(b) existed. Id. In reaching its decision, the court relied in part on legislative material that section 61.14(b) is meant to "provide an alternate method to a court to reduce or terminate alimony, without first having to find that there has been a change in financial circumstance, as is the case in current law." Id. at 951 (citing Sen. Staff Analysis, C.B./S.B. 152 at 12 (February 25, 2005)).
Unlike the Second District Court of Appeal in Buxton which determined that the economic impact on the obligee was only part of the analysis in determining if there is a supportive relationship, the trial court in this matter concluded that section 61.14(1)(b) requires a relationship economically equivalent to a marriage. We adopt the reasoning of the trial court. The statute itself is clear in this regard.
As a matter of law, section 61.14(1)(b) requires the court to determine if an alimony obligee has entered into a relationship that provides the economic support equivalent to a marriage, and if so, the court may reduce or terminate alimony as the equities require. Section 61.14(1)(b) is actually a codification of prior case law which held that, in post dissolution matters, cohabitation can be a basis for reduction or termination of alimony awards. See Zeballos v. Zeballos, 951 So.2d 972 (Fla. 4th DCA 2007); Reno v. Reno, 884 So.2d 462 (Fla. 4th DCA 2004). In the cohabitation cases, courts were required to determine whether and how the new living situation impacted the alimony recipient's financial condition and the continued need for alimony. Zeballos, 951 So.2d at 974; McBride v. McBride, 352 So.2d 1254 (Fla. 1st DCA 1977). Section 61.14(1)(b)2. now sets forth eleven nonexclusive statutory factors to guide the trial courts in determining when an economic supportive relationship exists between the parties. These factors include but are not limited to the length of cohabitation, and whether they have shown financial interdependence, agreed expressly or impliedly to support one another, actually supported one another, performed services for each other, bought property or assets together, or supported each other's children. The court may rely on any factor listed, as well as others not listed, either alone or in combination, as the circumstances may suggest to find that their cohabitation is a supportive relationship. § 61.14(1)(b)2., Fla. Stat. (2007). The factors are therefore suggestions or guidelines to assist the court in determining whether the cohabitation is supportive in the same way that modern marriage is supportive.
In its Final Order, the trial court performed a detailed analysis of the eleven statutory factors and the facts of the case that applied to each factor. After weighing the factors in relation to the facts of the case, the trial court found that the former wife and Mr. Stewart were not in a supportive relationship as set forth in the statute. The trial court's findings were supported by substantial competent evidence.
The evidence at trial was largely uncontradicted. The former wife and Mr. Stewart have resided together in his home for more than five years. They sleep in the same bedroom; they share cooking and household duties; and they host joint social events. Mr. Stewart pays the monthly mortgage on his home. The former wife's name is not on the title of Mr. Stewart's home or on the mortgage. The former wife and Mr. Stewart do not refer to each *308 other as husband and wife and they have not expressed any intent to marry. Each purchases groceries and household goods for the house which they freely share. They have never pooled their assets or income. The former wife has a savings account solely in her name. Her name is not on any of Mr. Stewart's bank accounts and she has no access to such accounts. They do not have and never have had a bank account containing intermingled funds. They have not purchased any property together. They have not expressed any intention to merge their assets or otherwise share any of the property they currently own or possess. The former wife has no credit cards and is not an authorized signer on Mr. Stewart's cards. The former wife pays Mr. Stewart $1,000 a month as a contribution toward monthly rent and utilities. She uses a nine-year-old automobile purchased and insured by Mr. Stewart's limousine business, and she also uses Mr. Stewart's membership privileges in a nearby country club. Mr. Stewart pays none of the former wife's monthly bills. He lent the former wife $5,000 several years ago and she still owes him $4,000. The former wife has not provided Mr. Stewart any financial support. Each has adult children from prior marriages, and each has an estate plan that leaves their assets to their respective adult children as beneficiaries. Neither has expressed an intention to change his or her estate plan to name the other as a beneficiary. There is no evidence that the former wife or Mr. Stewart has supported each other's children.
It was within the trial court's discretion to weigh these factors and reach an ultimate conclusion. This is clearly an evidence-based determination, specifically reserved to the trial court as the trier of fact. So long as the trial court acted within the broad confines of the reasonable person standard (i.e., that a reasonable person could have reached the same conclusion), the affirmance of that fact-based conclusion is required. The record does not show that the trial court abused its discretion in finding that there was no supportive relationship in this case that warranted a termination or reduction in the former wife's alimony. From the facts outlined above, a reasonable person could conclude that this was not a supportive relationship. We should thus defer to the trial court and affirm for that reason. See Zeballos, 951 So.2d at 974 (applying abuse of discretion standard of review to trial court's decision to reduce alimony under section 61.14); see also generally Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980) (explaining standard for appellate review when a judge exercises his discretionary power in determining alimony).
Furthermore, even if we ruled that a supportive relationship existed in this case, it would still be within the trial court's discretion to refuse termination of alimony. Section 61.14(1)(b) provides that a court "may reduce or terminate an award of alimony upon specific written findings by the court that since the granting of the divorce and the award of alimony a supportive relationship has existed between the obligee and a person with whom the obligee resides." (Emphasis supplied). The statute clearly makes termination or reduction of alimony permissive rather than mandatory, thus allowing the trial court to exercise sound discretion in light of the unique circumstances of each case.
The trial court further granted the former wife's petition to increase her alimony. Permanent periodic alimony was designed to provide the necessities of life to the former spouse as they were established by the marriage of the parties. Woolf v. Woolf, 901 So.2d 905, 911 (Fla. 4th DCA 2005). If there is a change of circumstances *309 either party may apply for an increase or decrease in alimony. § 61.14(1)(a), Fla. Stat. (2007).
The trial court found that the former husband had experienced a dramatic increase in his income and assets since 2003 when the parties agreed to a downward modification of alimony. At trial, the former husband testified that at the time of the modification in 2003 he possessed about $36,000. He has since inherited approximately $350,000 from his late mother's estate and receives approximately $68,000 per year from the estate of his late grandfather. This amount will continue until November 2025, at which time his 1/29 share of the corpus of the estate will be distributed and the former husband will receive his full share of the principal of the corpus. According to his financial affidavit, the former husband has a net monthly income of $10,000. He lives in a four bedroom, three bath waterfront home with a swimming pool in a golf course community. The former husband's home is valued at approximately $500,000. He owns a large brokerage account with Ameritrade and a retirement account valued at $126,000.
The former husband lost over $500,000 in the stock market in the last two years. However, the former wife should not be penalized because of his day-trading decisions. Linn v. Linn, 523 So.2d 642, 643 (Fla. 4th DCA 1988) ("[P]oor management of one's income is not the equivalent of a substantial change in circumstances sufficient to warrant a downward modification of an alimony award.") Although the former husband has made poor investment decisions, he nevertheless clearly had an ability to pay alimony sufficient to meet the former wife's current needs.
The former wife is a self-employed psychotherapist with a net monthly income of $1,598.04. Since the modification in 2003, the former wife's net worth has only slightly increased as a result of an inheritance of $90,000 from her late mother's estate, of which there remains approximately $45,000 after having dissipated same for deficit spending for her monthly living expenses and attorneys' fees and accountant fees. She is now sixty-three years old, having entered into her field of psychotherapy in her early fifties after a twenty-seven year marriage. The trial court found that the former wife has been living at subsistence level, doing without many of the things that she enjoyed during her marriage and which the former husband still enjoys.
The standard of review for modification of alimony is abuse of discretion. Woolf, 901 So.2d at 911. The trial court did not abuse its discretion in increasing the former wife's alimony. There is substantial competent evidence that supports an increase in alimony since the modification in 2003.
The trial court also awarded the former wife temporary appellate attorney's fees and costs in connection with the former husband's appeal of the lower court's final judgment. The trial court ordered the former husband to reimburse the former wife $20,000 for her temporary appellate attorney's fees and costs. The former wife had already paid her attorney $16,000 from her own funds. The former husband appealed this award. There is a significant disparity in the parties' finances as to create a substantial financial imbalance. The former husband has the ability to pay the temporary appellate fees and costs awarded to the former wife. A reasonable award should not be disturbed on appeal. Costa v. Costa, 951 So.2d 924, 925 (Fla. 4th DCA 2007) (citing Nichols v. Nichols, 907 So.2d 620, 622 (Fla. 4th DCA 2005), and Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980)). Given the unrefuted disparity *310 in the parties' incomes and assets, the former wife should not be required to place herself in a position where she would, in effect, substantially deplete all or a significant portion of her assets to pay her appellate attorney's fees and costs.
For the reasons stated above, we affirm the final judgment denying the former husband's petition to terminate alimony and granting the former wife's counter-petition for an upward modification in alimony. The award of temporary appellate attorney's fees and costs is also affirmed.
Affirmed.
TAYLOR, J., concurs.
FARMER, J., dissents with opinion.
FARMER, J., dissenting.

[T]he phrasing of a document ... seldom attains more than approximate precision. . . .

[L]aws are not abstract propositions. They are expressions of policy arising out of specific situations and address the attainment of particular ends. The difficulty is that the legislative ideas which laws embody are both explicit and immanent. And so the bottom problem is: What is below the surface of the words and yet fairly a part of them?. . .

Statutes come out of the past and aim at the future. They may carry implicit residues or mere hints of purpose. Perhaps the most delicate aspect of statutory construction is not to find more residues than are implicit nor purposes beyond the bound of hints. . . .

Legislation has an aim; it seeks to obviate some mischief, to supply an inadequacy, to effect a change in policy.. . . That aim . . . is . . . evinced in the language of the statute, as read in light of other external manifestations of purpose. That is what the judge must seek and effectuate.. . .[1]

Compunctions about judicial legislation are right enough as long as we have any genuine doubt as to the breadth of the legislature's intent; and no doubt the most important single factor in ascertaining its intent is the words it employs. But the colloquial words of a statute have not the fixed and artificial content of scientific symbols; they have a penumbra, a dim fringe, a connotation, for they express an attitude of will, into which it is our duty to penetrate and which we must enforce ungrudgingly when we can ascertain it, regardless of imprecision in its expression.[2]

[I]t is now well settled that textual interpretation must account for the text in its social and linguistic context. Even the strictest modern textualists properly emphasize that language is a social construct. They ask how a reasonable person, conversant with the relevant social and linguistic conventions, would read the text in context. This approach recognizes that the literal or dictionary definitions of words will often fail to account for settled nuances or background conventions that qualify the literal meaning of language and, in particular, of legal language.[3]
*311 I am afraid the majority's reading of this statute won't do. There is no real attempt to ascertain the legislative idea immanent in the text, to find the central meaning lying just below the surface of the words but indelibly part of them. The majority eschews the other, very real, manifestations of the legislative purpose, and concentrates instead on a simplistic reading of a single, common word with multiple and contradictory meanings, that is omnipresent in statutes and legal writing. They have, in short, failed to account for the purpose of statutory text in its social, legal and linguistic context. Their reading eviscerates the very purpose of the legislation and leaves the law where it was before the statute was enacted. I cannot join this misreading of statutory law.
In my opinion, this case should be decided under the reading of this statute I laid out in an opinion I prepared for the panel. I append it below.
When these former spouses were divorced in 1992, the trial court awarded permanent periodic alimony as support, which the former husband has since continuously paid. In 2002 she and a man with whom she is not married began cohabiting. One year later the parties consented to a reduced amount of alimony in an agreed order. Two years after that, he brought this proceeding to terminate alimony, citing the recent enactment of statutory authority to terminate alimony when the recipient cohabits in a supportive relationship tantamount to marriage.[4] She countered with a request to return the amount to its original level. We now have the final order denying termination and any reduction and granting her request.
The evidence at trial was straightforward and almost entirely unrefuted and uncontradicted. When she and Jim began cohabiting, they held a party for more than 50 guests. She has now been cohabiting with Jim for five years. In an obituary for Jim's mother, one newspaper described her as Jim's "companion." She did not take his surname. They do not call each other husband or wife. They have not indicated in any way that they intend to marry.
He has a limousine business. He pays the mortgage on the house, which he owns. She is not on the title or mortgage. She supports their cohabitation by paying Jim $1,000 monthly. They share cooking and household responsibilities and sleep together. Each purchases groceries and household goods for the house which they freely share. Jim provides her with an automobile and membership in a nearby country club. Several years ago Jim also lent her $5,000. She still owes him $4,000. They did not pool their personal assets or income. She kept her own bank accounts and property. Jim kept his.
These are the facts supported by the evidence in this case. We must consider the proper application of law to these facts.
It has long been the rule in Florida that alimony for support is terminated when the recipient of the alimony remarries. See Carlton v. Carlton, 87 Fla. 460, 100 So. 745 (1924) ("As the divorced wife has married, she is not entitled to alimony or maintenance and support."); Claughton v. Claughton, 393 So.2d 1061 (Fla.1980) ("[T]emporary alimony payments which had been established by previous court *312 order were terminated by the remarriage. Also barred is any facet of periodic or lump sum alimony which is predicated on the need to support the wife."); Friedman v. Schneider, 52 So.2d 420 (Fla.1951) ("Where the periodic payments represent only the amounts the court decides are necessary to afford shelter, food and clothing from time to time for the quondam wife, her marriage to another ends the obligation."); Hartzell v. Hartzell, 434 So.2d 353 (Fla. 4th DCA 1983) ("Alimony in the traditional sense based upon a need for support and an ability to pay is not appropriate after remarriage of the party seeking support."); see also 25A FLA. JUR.2D, Family Law, § 697. As these cases show, termination of alimony upon marriage is not discretionary. It is a rule that terminates alimony upon marriage, and it is applied without regard to any issue of need for support and the ability to pay. There is no balancing of equities.
The question posed in this case is whether, based on the evidence at trial, the cohabitation of the former spouse without a formal marriage should, as a matter of law, also compel the termination of alimony. Before section 61.14(1)(b) was adopted in 2005, the courts had held that alimony could not be terminated based on the argument that cohabitation is a de facto marriage, and that it may be only modified. See e.g. Reno v. Reno, 884 So.2d 462, 465 (Fla. 4th DCA 2004) ("A trial judge may not order that alimony cease simply because the alimony recipient cohabits with another person, even when this arrangement appears to be one consistent with a de facto marriage."); Bridges v. Bridges, 842 So.2d 983, 984 (Fla. 1st DCA 2003) (holding that Florida law does not recognize cohabitation as a basis for automatic termination of court ordered alimony); Kenyon v. Kenyon, 496 So.2d 839 (Fla. 2d DCA 1986) (same); Schneider v. Schneider, 467 So.2d 465 (Fla. 5th DCA 1985) (same). In DePoorter v. DePoorter, 509 So.2d 1141 (Fla. 1st DCA 1987), the court explained:
"We note ... that Florida jurisprudence does not accord legal status to the concept of de facto marriage. . . . While unmarried cohabitation raises a presumption of changed circumstances, this factor alone will not support a reduction of alimony."
509 So.2d at 1144.
Section 61.14(1)(b)the new legislation adopted in 2005provides the following:
"The court may reduce or terminate an award of alimony upon specific written findings by the court that since the granting of a divorce and the award of alimony a supportive relationship has existed between the obligee and a person with whom the obligee resides."
§ 61.14(1)(b), Fla. Stat. (2007). By requiring only the existence of a supportive relationship, the text is not restricted to the recipient being supported by someone with whom she cohabits. Under this statute, a supportive relationship also comprehends the alimony recipient contributing to the support of the person with whom she cohabits. Because the statute does not specify that the support be unilateral or who must provide the support, it covers all the possibilities: he supports her; she supports him; they each contribute to the support of the other.
The statute contains a non-exclusive list of factors the court can consider to determine whether a relationship is supportive, including the length of cohabitation, and whether they have shown financial interdependence, agreed expressly or impliedly to support one another, actually supported one another, performed services for each other, bought property or assets together, or supported each other's children. From *313 the text[5] we conclude that the individual factors listed are not each necessarily mandatory to any finding of a supportive relationship. The court may rely on any factor listedas well as others not listed either alone or in combination, as the circumstances may suggestto find that their cohabitation is a supportive relationship. The factors are therefore suggestions or guidelines to assist the court in finding whether the cohabitation is supportive in the same way that modern marriage is supportive.
As previously shown, the courts had already determined that the amount could be reduced when the recipient cohabits without marriage, even though it could not be terminated. See e.g. DePoorter, 509 So.2d at 1144. From the legislative drafting history, we know that the statute's central purpose was to grant clear jurisdictional authority to the court to terminate alimony simply upon a finding that a recipient is now cohabiting in a supportive relationship. As the drafters of the Senate Bill explained:
"These provisions provide an alternate method to a court to reduce or terminate alimony without first having to find that there has been a change in financial circumstance, as is the case in current law."[6]
and
"This committee substitute authorizes the court to reduce or terminate an award of alimony where the court has made specific written findings ... that a de facto marriage exists between the obligee and a person of the opposite sex."[7]
The question presented here concerns how this authority newly created by the statute was meant to be applied. Is it meant to be applied by the courts in the same way as the marriage rule automatically terminating permanent alimony? Or is it meant to be applied as the courts had already been treating cohabitation without marriageas a matter of judicial discretion in which the amount of alimony could be only reduced according to the unique facts and equities of each case?[8]
Because this is a statute, we must be guided by its plain text. The statute's essential provision says: "[t]he court may [e.s.] reduce or terminate. . . ." It is well established that may has multiple meanings. Among MERRIAM-WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (CD edition) definitions for may are these:
"2a: have permission to (you may go now) ... used nearly interchangeably with can

. . .
5: SHALL, MUSTused especially in deeds, contracts, and statutes." [e.s.]
Id.[9] The issue turns on which of these senses most nearly fits the Legislature's *314 purpose. The meaning in MERRIAM-WEBSTER'S definition 2a suggests itself as a new grant of authority to do something previously unauthorized. This is in keeping with the prior decisions holding that the court lacked "jurisdiction" (or authority) to terminate alimony when the recipient cohabits rather than marries someone. This meaning is reinforced by the meaning in definition 5. That is to say, the court must terminate or reduce alimony upon a finding of cohabitation in a supportive relationship.
In this instance, from both the statutory context and the background of the adoption of the statuteas explained in the Senate Analysisit is apparent that the Legislature was doing something more than mere traditional discretion-granting. One strong indicator is the statutory context. It is striking to compare the authority granted by the new statute with the previous statutory authority on modifying alimony. The new authority is, in the statute's words, the power to "reduce or terminate [e.s.] an award of alimony." § 61.14(1)(b). But in the subsection already dealing with modifying alimony generallysection 61.14(1)(a)the precise authority granted states:
"the court has jurisdiction to make orders as equity requires, with due regard to the changed circumstances or the financial ability of the parties or the child, decreasing, increasing, or confirming the amount of ... alimony provided for ...." [e.s.]
The emphasized text in section 61.14(1)(a) quoted above is missing from the new one. Section 61.14(1)(b) does not refer to making such orders as equity requires. Nor does it include the power to increase or confirm the amount of alimony. In the new statute, the only change the court can make is to terminate supportive alimony or reduce it. When cohabitation in a supportive relationship is shown, the new grant of authority is obviously intended to be disadvantageous to the recipient of alimony.
When the Legislature voted on this statute, the existing legal landscape held that the courts had no power to treat cohabitation as having the same effect on alimony that remarriage produces. With remarriage, the central reason for terminating alimony was tied to the justification for the award of alimony in the first place. If alimony is intended as support for a former spouse having a need, and the former spouse has now entered into a supportive relationship in which she receives the kind of support found in marriage, what is the justification for requiring her former spouse also to continue supporting her? Why should the law require that a previously married person be supported by two separate members of the opposite sex: one from whom she is divorced and one with whom she is cohabiting? For purposes of the policies justifying a termination of alimony, what would be the rationale for distinguishing between remarriage and mere cohabitation in a supportive relationship?
*315 By the very enactment of this new statute, the Legislature concluded that there is no justification for such a distinction. Without any legal basis for distinguishing between the two, the statute must mean that for purposes of terminating alimony there is no difference between marriage and cohabitation with support. With that recognition, we can perceive that the many possible meanings of may have been narrowed. As used in section 61.14(1)(b), the term may is now obviously much more compatible with the meaning in sense 5 of MERRIAM-WEBSTER'S definitions quoted above.[10] With cohabitation in a supportive relationshipjust as with marriagesupportive alimony should ordinarily be terminated. Hence the new statute both empowered and directed courts to do that which they had previously lacked the power to do.
But often alimony may also be traditionally used for reasons other than pure supporte.g. to equalize property distribution; or to provide for unusual circumstances involving family members with disabilities. The authority to reduce alimony upon cohabitation in a supportive relationship would therefore seem designed to make clear that it is only support for the former spouse that is terminated, and not any portion of alimony serving some other purpose. As it happens, that is precisely the rule in the remarriage cases. See Friedman v. Schneider, 52 So.2d 420 (Fla.1951) ("Where the periodic payments represent only the amounts the court decides are necessary to afford shelter, food and clothing from time to time for the quondam wife, her marriage to another ends the obligation."). Accordingly, section 61.14(1)(b)'s alternative of reducing alimony ("court may reduce or terminate"), applies only when some of the alimony previously awarded is not for support of the former spouse. In other words, in spite of including both terminate and reduce in the same provision, the statute aims to terminate all supportive alimony upon a finding of a supportive relationship. If the alimony is all supportive, then all of it must be terminated. If some is not supportive, then that part serving a purpose other than support is not affected by the new statute.
Finally, this construction is strongly suggested by the inclusion in the statutory text of a statement of its effect on the existing law of marriage:
"This paragraph does not abrogate the requirement that every marriage in this state be solemnized under a license, does not recognize a common law marriage as valid, and does not recognize a de facto marriage. This paragraph recognizes only that relationships do exist that provide economic support equivalent to a marriage and that alimony terminable on remarriage may be reduced or terminated upon the establishment of equivalent equitable circumstances as described in this paragraph."
§ 61.14(1)(b)3, Fla. Stat. (2007). The statute adds that it is not meant to deal with sexual relationships outside marriage: "The existence of a conjugal relationship, though it may be relevant to the nature and extent of the relationship, is not necessary for the application of the provisions of this paragraph." Id. Instead, it is the existence of cohabitation in a supportive relationship with its essential ingredient of *316 financial interdependence that the legislation addresses.
There is a powerful reason for the Legislature to emphasize that it was not abrogating the long societal tradition of marriages solemnized in the manner provided by law as the basis for cohabitation. If the Legislature had merely reduced alimony upon supportive cohabitation, it might have been understood as granting legal recognitionat least, tacit approvalto the growing societal incidence of such cohabitation without marriage. It might have been seen as impliedly reinstating common law marriage. So, the Legislature took the trouble to underline its purpose that the statute recognizes that "relationships do exist that provide economic support"[11] outside of remarriage and that supportive alimony should be eliminated, as with remarriage, when cohabiting partners "conduct[] themselves in a manner that evidences a supportive relationship."[12]
These legislative statements reaffirming the social importance of marriage over cohabitation cannot be swept aside as though they have no role in explaining the meaning of the new statute. As the court emphasized in State v. Goode, 830 So.2d 817, 824 (Fla.2002):
"a basic rule of statutory construction provides that the Legislature does not intend to enact useless provisions, and courts should avoid readings that would render part of a statute meaningless. See Unruh v. State, 669 So.2d 242, 245 (Fla.1996); Forsythe v. Longboat Key Beach Erosion Control Dist., 604 So.2d 452, 456 (Fla.1992)."
The Legislature's careful reaffirmation of the role of traditional marriage means that in applying the new rule it did not intend for courts to construe the statute in such a way as to discourage marriage. The traditional rule terminating alimony upon marriage was demonstrably left untouched and, thereby, reaffirmed. By this, the Legislature was giving direction to courts as to the meaning of the new statute and its intended application.
And so we confront the problem with reading the term may in the statute as a simple grant of discretion, in which the termination of the supportive alimony may be declined in spite of a supportive relationship in cohabitation. If that were the construction, the new law would effectively impose adverse consequences on recipients who remarry but withhold those same adverse consequences from those who merely cohabit without marriage. The law would thus formalize a strong disincentive to marry rather than to cohabit. Such an invidious construction would result in a decidedly peculiar inversion of the Legislature's policy valuesrewarding those who cohabit with financial advantage while denying it to those who remarry. That would not be a construction of statutory text but a destruction of the law.
To repeat, when an alimony recipient marries, courts do not consider whether the new spouse will support the recipient to the same extent as the payor does through alimony. The rule is not, then, to merely adjust the amount of the support downward. Supportive alimony is not just reduced but is terminated entirely without any such weighing or analysis. In this new legislation it has been made patent that the only basis for ending alimony is that "a supportive relationship has existed between the obligee and a person with whom the obligee resides."[13] Notably, *317 there is no requirement to show that the obligee's financial need has been thereby lessened and that the court should balance the new support with the existing support paid by the former spouse and adjust it up or down to some new level.
Properly understood, therefore, the text actually adopted and signed into law strongly indicates that the Legislature did not intend to continue the termination of alimony as only a marriage penalty. An essential purpose of the new statute was to eliminate any financial incentive to cohabit without marriage. Construing the statute to enact a mere discretionary reduction of supportive alimony upon cohabitation would in fact regenerate the strongest possible disincentive to marry. If the purpose was to end the distinction between marriage and cohabitation, such a construction would render the statute all but meaningless. In short, cohabiting in a supportive relationship must mean the end of supportive alimonyjust as in the marriage cases.
In this case, the evidence showed what can be deemed only a financially inter dependent supportive relationship.[14] Jim supports her financially as well as emotionally. She supports Jim financially as well as emotionally. They support each other. They share their days and holidays, a bed and a house, its provisions and benefits. She pays monthly support of $1,000. He pays the mortgage, some other household expenses and provides a club membership. If this woman and this man had solemnized this identical relationship with marriagebut without merging their separate assets and bank accounts into joint ownershipno Florida court would hesitate to hold as a matter of law that alimony should be ended. With section 61.14(1)(b), the result is now no different where, as here, they lack only the marriage certificate.
In modern marriage, the parties do not always cede their property to the entireties. Their cohabitation mirrors countless second marriages among men and women of a certain age in this state. Nor does it differ from numerous first marriages in which the parties have bound themselves by an ante-nuptial agreement to keep separate each other's property and income. No one thinks such marriages non-supportive. Nothing in this new statute suggests that any decision not to pool assets makes cohabitation any less supportive. There is simply no basis to conclude that the legislators intended that termination of supportive alimony should turn on the cohabitative partnership owning all the assets of each.
The statute says that the court "may reduce or terminate alimony" when cohabitation is supportive. When the statute was adopted, courts were already terminating alimony upon marriage but reducing alimony upon cohabitation only after newly re-analyzing need and ability. If the new statute were construed to mean that the trial judge has discretion merely to reduce supportive alimony upon cohabitation, the statute would end up serving no purpose and we would be back where we were when it was enacted. In the matter of terminating alimony, the new statute would not place cohabitation on the same legal footing as marriage. Those who marry would forfeit alimony, but those who cohabit without marriage would not. The marriage penalty and its existing disincentive to marry would continue as though the legislature had done nothing.
The trial court should terminate the alimony.
NOTES
[1] Felix Frankfurter, Some Reflections on the Reading of Statutes, 47 COLUM. L. REV. 527 (1947).
[2] Comm'r of Internal Revenue v. Ickelheimer, 132 F.2d 660, 662 (2nd Cir.1943) [per Learned Hand, J.].
[3] John F. Manning, The Absurdity Doctrine, 116 HARV. L. REV. 2387, 2392-93 (2003).
[4] See Ch. 2005-168, Laws of Fla., now codified as § 61.14(1)(b), Fla. Stat. (2007); see also Peter L. Goldstone and Andrea E. Goldstein, Codifying Cohabitation as a Ground for Modification or Termination of AlimonySo What's New?, 80 FLA. BAR J. 45 (2006).
[5] "The court shall give consideration, without limitation, to circumstances, including, but not limited to, the following . . . ." [e.s.] § 61.14(1)(b).
[6] See Senate Staff Analysis and Economic Impact Statement, Senate Bill 152 (2005).
[7] Id.
[8] See § 61.08, Fla. Stat. (2006); and Canakaris v. Canakaris, 382 So.2d 1197 (Fla.1980).
[9] See also AMER. HERITAGE DICT. OF ENG. LANG. (3d ED.) 1112 ("I. To be allowed or permitted to: ... 5. To be obliged; must. Used in statutes. . . ."); OXFORD ENG. DICT. (COMPACT ED.) 1051 ("B.II. 2. Expressing ability or power; = CAN . . . . 4.a. Expressing permission or sanction; To be allowed (to do something) by authority, law . . . . b. Law. In the interpretation of statutes, it has often been ruled that may is equivalent to shall or must.").

And See BLACK'S LAW DICT. (7th ed.) 993 ("1. Is permitted to . · This is the primary legal senseusu. termed the `permissive' or `discretionary' sense.... 3. Loosely, is required to; shall; must · In dozens of cases, courts have held may to be synonymous with shall or must, usu. in an effort to effectuate legislative intent."). See generally Minor v. Mechanic's Bank of Alexandria, 26 U.S.(1 Pet.) 46, 7 L.Ed. 47 (1828) (recognizing the general rule in the construction of public statutes that the word may is to be construed must in all cases where the legislature mean to impose a positive and absolute duty, and not merely to give a discretionary power; and in all cases the construction should be such as carries into effect the true intent and meaning of the legislature in the enactment).
[10] This construction has an ancient foundation in Florida law. See Weston v. Jones, 41 Fla. 188, 194-95, 25 So. 888, 890 (1899) ("It is a familiar rule that, when a statute directs the doing of a thing for the sake of justice, the word `may' means the same as `shall.' [c.o.] Again, permissive words in a statute respecting courts or officers are imperative in those cases where individuals have a right that the power conferred be exercised.").
[11] § 61.14(1)(b)3.
[12] § 61.14(1)(b)2.a.
[13] § 61.14(1)(b).
[14] See § 61.14(1)(b)2c ("The extent to which the obligee and the other person have . . . otherwise exhibited financial interdependence").